# EXHIBIT A

Michael Rosenthal, WSB #5-2099
Nathan Nicholas, WSB #7-5078
Hathaway & Kunz, LLP
P.O. Box 1208
Cheyenne, WY  82003-1208
(307) 634-7723
Fax:  (307) 634-0985
mike@hkwyolaw.com
nnicholas@hkwyolaw.com

Brice M. Timmons (TN Bar #29582)
Bryce Ashby (TN Bar #026179)
Craig Edgington (TN Bar #038205)
*Pro Hac Vice*
Donati Law, PLLC
1545 Union Ave.
Memphis, TN  38104
(901) 209-5500
Fax: (901) 278-3111
brice@donatilaw.com
bryce@donatilaw.com
craig@donatilaw.com

Frank L. Watson, III (TN Bar #015073)
*Pro Hac Vice*
Watson Burns, PLLC
253 Adams Avenue
Memphis, TN  38104
(901) 529-7996
Fax: (901) 529-7998
fwatson@watsonburns.com

ATTORNEYS FOR PLAINTIFFS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| CARLIE SHERMAN, ANNA GOZUN, AMANDA NASH, ANDREW SCAVUZZO, and EHAN JELINEK on behalf of themselves and all similarly situated persons, | ) ) ) ) ) | **Case No. 20-CV-00215-SWS** |
| PLAINTIFFS, | ) ) | **CLASS ACTION COMPLAINT FOR** |
| v. | ) ) ) | **VIOLATIONS OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. §** |

|  | ) | **1595, FEDERAL RACKETEER** |
|  | ) | **INFLUENCED AND CORRUPT** |
|  | ) | **ORGANIZATIONS ACT, 18 U.S.C. § 1964,** |
|  | ) | **AND WYOMING COMMON LAW** |

**TRINITY TEEN SOLUTIONS, INC.,** a )
Wyoming corporation; **TRIANGLE CROSS** )       **JURY TRIAL DEMANDED**
**RANCH, LLC**, a Wyoming limited liability )       **PURSUANT TO FED. R.  CIV. PRO. 38(a)**
corporation; **MONKS OF THE MOST** )       **& (b)**
**BLESSED VIRGIN MARY OF MOUNT** )
**CARMEL, d/b/a MYSTIC MONK COFFEE**, a )
Wyoming corporation; **GERALD E.** )
**SCHNEIDER**; **MICHAELEEN P.** )
**SCHNEIDER**; **ANGELA C. WOODWARD**; )
**JERRY D. WOODWARD; DANIEL** )
**SCHNEIDER; MATHEW SCHNEIDER;** )
**MARK SCHNEIDER; KARA WOODWARD**; )
**KYLE WOODWARD; THOMAS GEORGE;** )
**JUDITH D. JEFFERIS**; **DALLY-UP, LLC**, a )
Wyoming limited liability corporation; **ROCK** )
**CREEK RANCH, INC.**, a Delaware corporation; )
**DIOCESE OF CHEYENNE**, a Wyoming )
corporation; and the **SOCIETY OF OUR LADY** )
**OF THE MOST HOLY TRINITY**, a Texas )
corporation; and the **NEW MOUNT CARMEL** )
**FOUNDATION, INC.**, a Wyoming corporation;**,** )
                                                                                  )
          DEFENDANTS.                                      )

---

# FIRST AMENDED COMPLAINT

---

TO THE HONORABLE DISTRICT COURT JUDGE:

Plaintiffs Carlie Sherman, Anna Gozun, Amanda Nash, Andrew Scavuzzo, and Ehan

Jelinek (hereinafter collectively "Plaintiffs") on behalf of themselves and all other similarly

situated persons, by and through their designated attorneys, bring this action against Defendants

Trinity Teen Solutions, Inc., Triangle Cross Ranch, LLC., Monks of the Most Blessed Virgin Mary of Mount Carmel, d/b/a Mystic Monk Coffee, Gerald ("Jerry") Schneider, Michaeleen P. Schneider, Angela ("Angie") Woodward, Jerry D. Woodward, Daniel Schneider, Mathew Schneider, Mark Schneider, Kara Woodward, Kyle Woodward, Thomas ("Tom") George, Judith Jefferis, Dally-Up, LLC, Rock Creek Ranch, Inc., Diocese of Cheyenne, Society of Our Lady of the Most Holy Trinity, and the New Mount Carmel Foundation, Inc. (hereinafter collectively "Defendants"). Plaintiffs allege as follows:

## I.

## <u>NATURE OF THE ACTION</u>

1.      Human trafficking remains a shockingly prevalent practice throughout the world. It has become an epidemic in the United States.  Human trafficking victimizes vulnerable persons by forcing, defrauding, or otherwise coercing them into sexual or labor exploitation. In 2000, Congress first enacted the Trafficking Victims Protection Act to combat the exploitation of individuals, especially women and children, coerced into the sex trade, slavery, and involuntary servitude. The act takes an expansive view of trafficking ranging from violent coercion into the sex trade to the use of psychological, financial, and legal means to frighten individuals into providing labor without compensation.

2.      The "troubled teen industry" is a predatory industry that operates across the United States, especially in rural areas where the oversight of mental health facilities and residential facilities for minors is difficult or impracticable. These companies promise the parents of teens with mental and emotional disturbances, problems with delinquency, and addiction issues respite

from the challenges of treatment and parenting their children with too-good-to-be-true promises of cutting-edge therapies and education in a residential setting. Often these facilities are unlicensed and unregulated or operate in legal gray areas. These companies charge desperate parents shockingly high prices while simultaneously providing little to no actual treatment and substandard education. The legal status of these facilities varies from state to state, and not all such facilities are created equal. While some are well-intentioned, others are riddled with abusive conduct and cause serious harm to their residents. The dangers posed by these companies are so serious that the University of South Florida and the Bazelon Center for Mental Health Law founded the Alliance for the Safe, Therapeutic, Appropriate use of Residential Treatment in response to this growing industry that profits over $1 Billion dollars annually housing between ten and fourteen thousand minor children a year.

3.      This is an action brought by and on behalf of human trafficking victims the troubled teen industry.  Defendants Gerald ("Jerry") Schneider and Michaeleen P. Schneider (hereinafter "Defendant Triangle Owners") have owned the property now operated as the Triangle Cross Ranch, Inc. (hereinafter the "Triangle Ranch" or "TCR") since 1973.  The Triangle Ranch is advertised as a fifty thousand (50,000) acre working ranch with over one thousand (1,000) head of cattle which is believed to cross state lines between Wyoming and Montana. Defendant Triangle Owners founded Mount Carmel Youth Ranch (hereinafter "Mount Carmel"), a Wyoming nonprofit corporation, which operated at the same location to provide group home licensed services to troubled teens. When the Mount Carmel board of directors decided to close the facility and turn in their license in November 2012, Defendant Triangle Owners wanted to "continue the

good work that had been going on at Mount Carmel,"[1] so in December 2012, Defendant Triangle Owners applied to the Wyoming Department of Family Services (hereinafter "DFS") for a license in the name of Triangle Cross. That application process closed March 6, 2013, due to the Defendant Triangle Owners failure to provide the necessary information for its completion to DFS. Defendant Triangle Owners operated the Triangle Cross Ranch for nearly two (2) years without a license as required by Wyoming law until the Wyoming Supreme Court enjoined Defendant Triangle Owners from continuing to operate the Triangle Ranch. *See Triangle Cross Ranch, Inc. v. State*, 2015 WY 47, ¶ 21, 345 P. 890, 895 (Wyo. 2015). DFS allegedly received information that Defendant Triangle Owners were operating the Triangle Ranch without the appropriate license and sent a cease and desist letter to Defendant Triangle Owners on July 27, 2013. Upon information and belief, Defendant Gerald Schneider informed DFS on August 27, 2013, that Defendant Triangle Owners relocated all operations related to minor children to portions of the ranch located in Montana to avoid Wyoming State certification and regulatory oversight rather than obtain the proper certifications in Wyoming. Defendant Triangle Owners re-opened the Triangle Ranch in Wyoming in 2018 under the guise of a Wyoming group home and began continuing their pattern of systematic abuse and exploitation of delinquent teenage boys for their labor.

---

[1] Plaintiffs aver Defendant Triangle Owners' true desire for licensing was to continue the exploitation of troubled minor teenage boys by charging their parents upwards of $6,000 a month for services that Defendant Triangle Owners had no intention of providing while forcing troubled minors to engage in forced labor.

4.      Upon information and belief, Defendant Jerry Schneider had his daughter, Defendant Angela ("Angie") Woodward and her husband set up a similar ranch for troubled teenage girls beginning in 2002. Defendants Angela ("Angie") Woodward and Jerry Woodward (hereinafter "Defendant Trinity Owners") own and operate Trinity Teen Solutions, Inc. (hereinafter "Trinity Ranch" or "TTS"), a Wyoming corporation which operates as a working ranch under the guise of a Residential Treatment Center in Park County, Wyoming. While registered with DFS as a "residential treatment center," they hold no licensure through the Wyoming Department of Health, nor are they licensed as a school. To obtain cheap and easily exploited labor for all Defendants, Defendant Triangle Owners and Defendant Trinity Owners (hereinafter collectively "Defendant Owners") engaged in a recruitment scheme whereby they induced and continue to induce parents of troubled minors to pay substantial sums of money under the guise that their children would receive cutting edge residential treatment, therapy, and continuing education.  Defendant Trinity Owners learned from and improved upon Defendant Gerald Schneider's model to better evade regulation and defraud not only parents but also private insurance companies.

5.      The TTS's Parent's Handbook, attached hereto as **Exhibit A,** lists just some of the following "treatment" modalities and activities that Plaintiffs or the putative class members would purportedly receive: wilderness therapy/outdoor behavior healthcare, reality therapy, experiential therapy, strategic therapy, animal assisted therapy, group therapy, individual therapy, Christ-centered counseling, rational emotive behavioral therapy, Eye Movement Desensitization Reprocessing, personality assessment, nutritional therapy, crisis intervention, art therapy,

relationship therapy, Bibliotherapy, cognitive restructuring, confrontive therapy, insight therapy, behavior modification, solution oriented therapy, symptom focused education, ordeal therapy, career counseling, and personality inventories/assessments. Very few if any mental health facilities in the United States actually offer this vast array of therapeutic interventions, which range from cutting-edge proprietary, manualized therapies requiring certifications and training that the underqualified staff of TTS have never received, to "therapies" that are simply made up for the purposes of marketing TTS.

6.      For example, Dialectical Behavioral Therapy ("DBT") and Eye Movement Desensitization Reprocessing ("EMDR") are cutting-edge, manualized therapies used to treat a variety of disorders. DBT is among the only therapy models clinically demonstrated to effectively treat borderline personality disorder and narcissistic personality disorder. EDMR is used in the treatment of PTSD. These therapies require extensive training and certification, and TTS does not actually offer these therapies while misrepresenting that it does so.

7.      For example, "Reality Therapy" was described in the July 2013 Triangle Ranch website as "an approach to psychotherapy and counseling . . . Reality therapy is considered a cognitive behavioral approach to treatment."

8.      In fact, "Reality Therapy," is a real therapy method developed during the Vietnam War at the Veterans Administration hospital in Los Angeles by Dr. William Glasser. It refers to a process that is people-friendly and people-centered, focusing on teaching them how fantasy can distract people from choices that are within their control in life. It has nothing to do with giving someone a "dose of reality" or the threat of punishment. By contrast, as practiced by TTS and its

co-conspirators at TCR, reality therapy is merely abuse. Defendant Gerald Schneider himself described "reality therapy" as practiced by TTS and its co-conspirators at the Triangle Cross Ranch trial.

> Reality therapy is kind of self-explaining, really. I mean on a ranch, okay, you can't control mother nature. You can only work with her. Okay? That's reality. Okay? Now, a young man can get pretty frustrated because it's so stinkin[g] cold out. Okay?
>
> And getting dressed and being prepared and that kind of thing is a -- is a reality of the therapy. Maybe I've told him, don't you come out without your boots and your coveralls on, and then I catch him out there. Okay? Uh-huh. You turn around and go back to the house. He's going to listen to me because he's cold.

The Wyoming Supreme Court's response to this testimony was to state: "The reality is that healthy people do not pay for the privilege of stacking hay." *Triangle Cross Ranch, Inc. v. State of Wyoming*, 2015 WY 47 at ¶16. This, of course, is not actually therapy. It is merely the forced labor of children in hazardous conditions.

9.     To obtain this labor, Plaintiffs and putative class members or their parents were promised an atmosphere in which troubled teenage minors could grow physically, academically, mentally, emotionally, socially, and spiritually through therapy and treatment. Instead of the atmosphere and treatment they were promised, Plaintiffs and others similarly situated were transported to Wyoming, often through legal kidnapping at the suggestion of Defendant Owners, and forced to work in unfathomable conditions while receiving little to no formal education, behavioral treatment, or therapy. They were made to labor from early morning until late at night, without pay, under the constant threat of physical and emotional punishment and further confinement.

10.     Defendant Owners and their recruitment agents defrauded Plaintiffs, other putative class members, and their parents throughout the recruitment process, inducing them into paying substantial fees for residential treatment, under promises of receiving full-time cutting edge therapies and while maintaining proper education towards high school graduation. Defendant Owners actually forced Plaintiffs and putative class members to work without pay for periods of time lasting between months and years.[2] Defendant Owners and/or their agents caused Plaintiffs and the putative class members to believe that if they did not work for Defendants, they would suffer physical or emotional abuse and prolonged confinement.

11.     Immediately upon Plaintiffs' and the putative class members' arrival at TCR and TTS, Defendant Owners and their agents blatantly disregarded the terms of residential or group treatment they had promised Plaintiffs, putative class members, and their parents and Defendant Owners immediately began exploiting Plaintiffs and the putative class members.

12.     Plaintiffs and the putative class members were immediately subjected to a jail style strip search upon arrival at both TCR and TTS. Defendant Trinity Owners and/or their agents required Plaintiffs or the putative class members to read the *Holy Cowgirl Manual* and forced Plaintiffs and the putative class members to sign the TTS Policies, Rules, Responsibilities, and Procedures Youth Contract agreeing to the abusive policies, rules, responsibilities, and procedures including, critically, submitting to the censorship of ingoing and outgoing mail and the monitoring of all telephone calls with their parents. The *Holy Cowgirl Manual* informed girls of a six (6) level

---

[2] TCR's website states most boys stay for 9-18 months, while TTS's Parents Handbook states the minimum length of stay is 45 days, and the average girl is at TTS for between 12 -18 months.

system that was required to be completed to obtain discharge from TTS. Defendant Owners and/or their agents began the systematic control of Plaintiffs and the putative class members by the threat of further confinement unless Plaintiffs and the putative class members completed all chores and ranch duties, including, but not limited to, running miles of irrigation lines, picking rocks out of fields for days at a time, setting thousands of fence posts, loading massive trucks of hay daily, repairing barbed wire fencing, cleaning, cooking, tending farm animals, birthing livestock, maintaining fires throughout the night due to Defendant Owners failure to provide heat, and performing labor for the other Defendants. Laboring conditions were hazardous, causing numerous injuries and even frostbite.

13.     Upon arrival at TTS, Plaintiffs and the putative class members were then transported to the cook cabin or the school room and each of the other exploited girls were required to state their name, level, and how long they had been at the facility.[3]

14.     Upon arrival at TCR, Plaintiffs and the putative class members were forced to watch the 2003 movie "Holes" starring Shia LaBeouf, which is a story about a wrongfully convicted boy who is sent to a brutal desert detention camp where he joins the job of digging holes for some mysterious reason without the chance of escape or freedom in sight. After having their will broken by the indoctrination video, Plaintiffs and the putative class members were subject to immediate forced labor after their initial jail style strip search.

---

[3] Plaintiffs aver that this introduction was another form of control by Defendants. When other workers would introduce themselves and state they had been level 1 for years Plaintiffs and the putative class members were immediately overcome with fear regarding the seriousness of complying with all labor requirements.

15.     Plaintiffs and the putative class members at TTS were then subjected to or threatened with food and sleep deprivation, physical punishment, emotional abuse, and humiliation, to include, but not limited to, being leashed to other exploited girls, staff members, and/or farm animals, carrying around a folding chair[4] as punishment for twenty-four (24) hours a day for months on end, forced silence for weeks at a time, being forced to run up and down a massive hill covered in sharp rocks and rattlesnakes, being forced to eat only small quantities of cold kidney beans for weeks at a time, participation in "group therapy" without a licensed therapist with the sole purpose of staff and other exploited girls degrading and humiliating the participant, to force compliance with mandated labor assignments. Plaintiffs and the putative class members were observed by staff members in the bathrooms, showers, and forced to sleep on the floor next to Defendant Owner's agents until they reached level two (2).[5]

16.     Plaintiffs and the putative class members at TCR were then subjected to or threatened with food and sleep deprivation, physical punishment, assault and battery, and emotional abuse.  Plaintiffs and the putative class members at TCR where provided a single pair of pants, a single shirt, two pairs of socks, and one pair of underwear. Defendant Triangle Owners created a dual tier system.  Plaintiffs and the putative class members at TCR were housed in rudimentary uninsulated sheds without any form of heat source, but equipped with solar powered

---

[4]  This was known as "solitary confinement" and "life review." It would often involve sitting in a chair facing a cabin wall for up to 16 hours a day without the ability to speak to other class members. Girls were only allowed to carry the chair when moving to their next labor task.

[5]  Upon information and belief, at least one girl remained level one (1) for a three-year period and it was not uncommon for girls to remain level one (1) for months.

alarms to prevent them from leaving. While they were considered "Wilderness Level" they were locked into these sheds without access to a latrine for extended periods and overnight and forced to urinate into jugs. Defecation presented a difficult problem in that most class members were unable to defecate into the jugs and simply had to defecate wherever they could. Plaintiffs and the putative class members at TCR could get upgraded to the Bunkhouse Level if they abided by all physical labor standards and chores. This would entitle them to better food, clothing, living inside with a heat source or window A/C unit and running water. If a Plaintiff or putative class member failed to abide by Defendant Triangle Owners' physical labor or chore demands they would be returned to "Wilderness Level."

17. Plaintiffs and the putative class members at both facilities were immediately cut off from communicating with their parents about conditions at TCR and TTS. All mail incoming and outgoing was read by staff members and Plaintiffs and the putative class members were forced to re-write communication to their parents if they stated anything negative about TCR or TTS. Furthermore, once telephone communication was authorized a TCR or TTS staff member observed all telephone communications and at all times had the ability to terminate the communication and often did terminate communications if Plaintiffs or the putative class members said anything negative about TCR or TTS.

18. Finally, Defendant Trinity Owners and/or their agents forced Plaintiffs and the putative class members to write testimonials for use in advertising prior to authorizing their release from TTS and would often prevent a Plaintiff's or putative class member's release until a positive review was submitted to perpetuate the vicious cycle of victimization. When residents would speak

out publicly about their abuse, TTS would threaten them with defamation lawsuits and utilize these positive testimonials as "evidence" that the abuse had not, in fact, occurred. In 2016, TTS did actually file a strategic lawsuit against public participation alleging defamation against three of its victims. That matter was removed to this Court and assigned to The Honorable Nancy D. Freudenthal before being dismissed by consent before any record was developed. Through their lawyer, Joseph Darrah, TTS made further threats to bring frivolous lawsuits against class members and Plaintiffs. Darrah sent a letter to counsel for class member Mollie Lynch threatening, "If we need to move forward formally with [filing a lawsuit against Mollie Lynch], we will not only bring an action against Mollie Lynch, we will likewise sue the girls she and Ms. Plander may have recruited who are also participants in the video [sharing their experience at TTS]."

19.    Defendant Owners' scheme was designed to make Plaintiffs and other putative class members afraid, intimidated, and powerless to leave Defendant Owners' employment while all Defendants profited or knowingly benefitted, financially or through receipt of free labor, from participation in a venture which all Defendants knew or should have known was unlawful.

## II.

## SUBJECT MATTER JURISDICTION AND VENUE

20.    This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) on the grounds that the claims asserted herein arise under the Trafficking Victims Protection Reauthorization Act (18 U.S.C. §§ 1589 *et seq.*) (hereinafter "TVPRA") and the Racketeer Influences and Corrupt Organizations Act (18 U.S.C. §§ 1961 *et seq.*).

21. With respect to the state law claims against Defendant Trinity Teen Solutions, Inc., Dally-Up, SOLT, and the Diocese of Cheyanne, this Court also has original subject matter jurisdiction over this Class Action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). Pursuant to § 1332(c)(2), the named Plaintiffs Carlie Sherman, Anna Gozun, and Amanda Nash are citizens of Illinois, South Carolina, and Minnesota, respectively. Pursuant to § 1332(d)(10), Defendant Trinity Teen Solutions, Inc. is a corporation organized under the laws of Wyoming, with its principal place of business in Powell, Wyoming, and, as such, is a citizen of the State of Wyoming. As a result, the named Plaintiffs and Defendant are citizens of different States, pursuant to § 1332(d)(2)(A).

22. Upon information and belief, the proposed Class exceeds 100 persons. Pursuant to the 28 U.S.C. § 1332(d)(6), the aggregate amount of the Class Members' claims substantially exceeds $5,000,000.00 and, thus, exceeds the requisite amount in controversy set forth in § 1332(d)(2).

23. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), (b) and (c) on the grounds that all or a substantial portion of the acts giving rise to the violations alleged herein occurred in this judicial district.

### III.

### THE PARTIES AND PERSONAL JURISDICTION

24. Plaintiff Carlie Sherman (hereinafter "Plaintiff Sherman") is an individual with an established residency in Lee County, Illinois.

25.     Plaintiff Anna Gozun (hereinafter "Plaintiff Gozun") is an individual residing in Greenville County, South Carolina.

26.     Plaintiff Amanda Nash (hereinafter "Plaintiff Nash") is an individual residing in Scott County, Minnesota.

27.     Plaintiff Andrew Scavuzzo (hereinafter "Plaintiff Scavuzzo") is an individual residing in Boulder County, Colorado.

28.     Plaintiff Ehan Jelinek (hereinafter "Plaintiff Jelinek") is an individual residing in Escambia County, Florida.

29.     The putative class members (hereinafter "Class Members") are all of the individuals confined at either TTS or TCR during the relevant statute of limitations period.

30.     Defendant Trinity Teen Solutions, Inc. (hereinafter "Defendant TTS" or "TTS") is a Wyoming corporation which operates a Wyoming State Residential Treatment Center in Park County, Wyoming with its principal place of business of at 112 Safe Haven, Powell, WY 82435. It may be served with process through its registered agent Defendant Angela C. Woodward at 64 Safe Haven, Powell, WY 82435.

31.     Defendant Triangle Cross Ranch, LLC[6] is a Wyoming limited liability company. Its principal place of business is 423 Road 1AF, Powell, WY 82435 and may be served with process through its registered agent Timothy D. Stewart at 1222 11th St., P.O. Box 1628, Cody,

---

[6] Triangle Cross Ranch, LLC operated without a license between 2012 – 2018. It was originally formed in 2012 as Triangle Cross Ranch, Inc. which was administratively dissolved in 2015. Gerald Schneider was at all times listed with the Wyoming Secretary of State as the Director.

WY 82414. Defendant Gerald Schneider is listed as the Organizer with the Wyoming Secretary of State.

32.   Defendant Monks of the Most Blessed Virgin Mary of Mount Carmel, d/b/a Mystic Monk Coffee (hereinafter "Mystic Monk Coffee" or "MMC" or "The Monastery"), is a Wyoming Religious Corporation which, in addition to its other activities, packages and sells coffee and accessories. Mystic Monk Coffee's principal place of business is 1079 Meeteetse Creek Rd., Meeteetse, WY 82433. It may be served with process through its registered agent Daniel Schneider[7] at 31 Rd AFW, Powell, WY 82435.

33.   Defendant Gerald ("Jerry") Schneider (hereinafter "Gerald Schneider") may be served with process at 423 Road 1AF, Powell, WY 82435.

34.   Defendant Michaeleen Schneider (hereinafter "Michaeleen Schneider") is the wife of Gerald Schneider. She may be served with process at 423 Road 1AF, Powell, WY 82435.

35.   Defendant Angela C. Woodward (hereinafter "Angela Woodard") may be served with process at 64 or 112 Safe Haven, Powell, WY 82435. Angela Woodward is as an owner, manager, and/or member of TTS and Dally-Up.

36.   Defendant Jerry D. Woodward (hereinafter "Jerry Woodard") may be served with process at 64 or 112 Safe Haven, Powell, WY 82435, and/or 89 Road 8RA, Powell, WY 82435. Defendant Jerry is an owner, manager, and/or member of TTS and Dally-Up.

37.   Defendant Father Daniel Schneider (hereinafter "Fr. Daniel Schneider") is the son

---

[7] Of note is the fact that Mystic Monk Coffee's registered agent is Defendant Gerald Schneider's son and Defendant Angela Woodward's brother.

of Defendant Gerald Schneider and brother of Angela Woodward. He is a monk and registered agent of Mystic Monk Coffee. Additionally, Fr. Daniel Schneider is the President of the Monks of the Most Blessed Virgin Mary of Mount Carmel. Fr. Daniel Schneider may be served at 31 Rd AFW, Powell, WY 82435.

38. Defendant Mathew Schneider (hereinafter "Mathew Schneider") is the son of Gerald Schneider and may be served with process at either 423 Road 1AF, Powell, WY 82435 or 402 Road 8VE, Powell, WY 82435. He is the Program Director and co-founder at both Mount Carmel Youth Ranch and at TCR[8].

39. Defendant Mark Schneider (hereinafter "Mark Schneider") is the son of Gerald Schneider and may be served with process at 423 Road 1AF, Powell, WY 82435. He is the Ranch Manager at TCR.

40. Defendant Kara Woodward (hereinafter "Kara Woodward") may be served at either 64 or 112 Safe Haven, Powell, WY 82435. Defendant Kara Woodward is an owner, manager, and/or member of TTS and Dally-Up. Also, Defendant Kara Woodward serves as the Staff Supervisor of TTS.

41. Defendant Kyle Woodward (hereinafter "Kyle Woodward") may be served at either 64 or 112 Safe Haven, Powell, WY 82435. Defendant Kyle Woodward is an owner, manager, and/or member of TTS and Dally-Up. Also, Defendant Kyle Woodward is the Assistant Director and Marketing Director of TTS.

---

[8] Of note is the fact that Mathew Schneider runs Rocky Mountain Frontier, LLC, a Wyoming limited liability company that operates as another boys' ranch on the same land as TCR.

42.     Defendant Thomas George (hereinafter "Thomas George" or "Tom") may be served at 391 Road 1AF, Powell, WY 82435.  Thomas George served as Executive Director of Mount Carmel Youth Ranch and TCR.  Additionally, he served as Special Projects Manager and a Family Life Coach.

43.     Defendant Judith Jefferis (hereinafter "Judith Jefferis") may be served at 108 Road 8RA, Powell, WY 82435 or 2300 Hilltop View Road, PA 19320. Judith Jefferis is the owner/operator of Rock Creek Ranch.

44.     Defendant Dally-Up, LLC (hereinafter "Dally-Up"), is a Wyoming limited liability company which owns the land on which Trinity Teen Solutions, Inc. operates. Its principal place of business is 64 Safe Haven, Powell, WY 82435 and may be served with process through its registered agent Defendant Jerry D. Woodward at 89 Road 8RA, Powell, WY 82435. Defendant Angela Woodward is an owner and operator of Defendant TTS.

45.     Defendant Rock Creek Ranch, Inc. (hereinafter "Rock Creek Ranch" or "RCR"), is a Delaware corporation which operates the adjacent ranch to TTS in Wyoming. Its principal place of business is 108 Road 8RA, Powell, WY 82435. It may be served with process through its registered agent Marshall Hesson at 142 Road 8RA, Powell, WY 82435.[9]

46.     Defendant Diocese of Cheyenne is a Wyoming nonprofit corporation and a United States diocese of the Roman Catholic Church, with its principal place of business in Cheyenne,

---

[9]  While the Wyoming Secretary of State Business Entity Search lists Marshall Hesson as the registered agent for Rock Creek Ranch, Inc., Plaintiffs aver that Marshall Hesson no longer works for Rock Creek Ranch and now is self-employed at Beartooth M Cavvy and Kennel. Plaintiffs' aver that Judith Jefferis, the President/Director of Rock Creek Ranch, Inc. is more likely currently the proper agent to serve process upon.

Wyoming. Its principal place of business is 2121 Capital Avenue, Cheyenne, WY 82001. It may be served with process to Jeffrey V. Nieters at the same address.

47.     Defendant Society of Our Lady of the Most Holy Trinity (hereinafter "SOLT") is a Texas corporation, and a Roman Catholic Religious Institute of Men, with its principal place of business in Robstown, Texas. At all times material herein, SOLT operated ministries in and conducted activities through the Diocese of Cheyenne. It may be served with process to Father John P. Gaffney[10] at 1200 Lantthana, Corpus Christi, TX 78407.

48.     Defendant New Mount Carmel Foundation, Inc.[11] (hereinafter the "Foundation") is a Wyoming nonprofit corporation.  Its principal place of business is 1079 Meeteetse Creek Rd., Meeteetse, WY 82435. It may be served with process through its registered agent Father Nicholas T. Maroney (hereinafter "Fr. Maroney") at 31 Road AFW, Powell, WY 82435.  Additionally, Fr. Maroney is the Secretary and Director of the Monks of the Most Blessed Virgin Mary of Mount Carmel.

49.     This Court has both general and specific personal jurisdiction over Defendants because each Defendant has had substantial and continuous contact with Wyoming, the grounds that the claims asserted against it arise from its transaction of business within Wyoming and on the grounds that it has committed a tortious act within Wyoming.  Furthermore, Defendants'

---

[10] Of note is that Thomas George was the registered Agent of SOLT between 2006 – 2010 at 402 Rd 8ve, Powell, WY 82435 according to the Wyoming Secretary of State until SOLT allowed its status to shift to inactive as it chose to operate under its Texas business filings.

[11] Plaintiff avers that the sole purpose of the Foundation is the support of The Monastery and that it is the primary source of support for The Monastery, therefore each hour of coerced child labor directly benefitted the Foundation with the knowledge and consent of its president, director, secretary, and other officers.

contacts and actions were directed toward Wyoming and thus warrant the exercise of personal jurisdiction over it.

## IV.

## FACTUAL ALLEGATIONS

### A.   Summary of Class Allegations

50.   On, or about, May 1, 1997, Defendants Gerald and Michaeleen Schneider, established Mount Carmel Youth Ranch (hereinafter "MCYR"), which had a history of problems to include, but not limited to, staff and residents suffering severe and permanent injuries, multiple failures to report serious incidents to Department of Family Services, and serious questions regarding its interlocked profit-making and nonprofit operations. Mount Carmel Youth Ranch, later rebranded as TCR, depriving its minor residents of basic human necessities. The Schneiders forced residents to conduct mechanical work[12], construction work[13], or agricultural work[14] depending on the resident's skill set and the time of year. The Schneiders forced residents to work their separate horse and cattle businesses, which raised between 250 and 1,000 calves per year.

---

[12] Mechanical work consisted of small engine repair, diesel mechanical work, installation of new transmissions, greasing vehicles, and general vehicle preventive maintenance and upkeep.

[13] Construction work consisted of constructing sheds and other permanent structures on the Triangle Ranch without any safety harnesses, equipment, or proper supervision.

[14] Agricultural work at TCR consisted mainly of feeding, grooming, branding, birthing, training, and overall taking care of hundreds to thousands of cattle, horses, and chickens daily. Residents were responsible for branding, herding, inoculation, and general veterinary care of all TCR's animals to include Defendant Gerald Schneider's personal herd of cattle.

51.     Upon information and belief, Defendant Thomas George at all times relevant to this matter served as Executive Director of Mount Carmel Youth Ranch and TCR.  Additionally, he served as Special Projects Manager and a Family Life Coach.  Finally, he served the Catholic Church as a lay missionary member of SOLT for over twenty years.  For six of those years as the International Regional Director of SOLT, directing the activities of Priests, Religious and Lay faithful within the Society. At all times relevant to these proceedings, he coordinated, approved, directed, and facilitated the use of child labor from MCYR and TCR at SOLT and other Catholic Church facilities.

52.     Upon information and belief, Defendant Gerald Schneider and Defendant Angela Woodward developed a joint scheme of operating for-profit businesses utilizing fraudulently obtained child labor under the guise of "Residential Treatment Centers" or "Group Homes," authorized to provide services to delinquent children by the Wyoming Department of Family Services.

53.     On or about, March 27, 2002, Defendants Angela Woodward and Jerry Woodard established TTS[15], a Wyoming corporation in Park County, following in Gerald Schneider's footsteps by depriving residents of basic human necessities while forcing residents to provide their labor through fear of physical and emotional harm and continued confinement.

---

[15] Defendant Angela also established Heavens Peak Behavioral Services, Inc. and operates it at the same principal address as TTS.  Upon information and belief, this for-profit corporation was set up as another means to bypass and defraud resident's insurance companies.

54. Defendants Angela Woodward and Jerry Woodward are the owners and operators of TTS. TTS sits on a 160-acre parcel located at 64 Safe Haven Road, Powell, WY 82435.

55. Prior to 2010, Defendant Owners and TTS leased 64 Safe Haven Road from Judith Jefferis. The land was purchased by Defendant Dally-Up, LLC and its registered agent Defendant Jerry D. Woodward. Upon information and belief, the land was purchased through this shell company to avoid liability for Defendant Owners egregious conduct.

56. Upon information and belief, in 2010 Defendant Owners and Defendant Judith Jefferis entered into a sale agreement, which included free labor and maintenance on Defendant Judith Jefferis' separate property located at 108 Road 8RA, Powell, WY 82435, and formally known as Rock Creek Ranch, in perpetuity. Plaintiffs and the putative class members have consistently provided forced labor to Defendant Judith Jefferis and Defendant Rock Creek Ranch since the 2010 sale, this labor includes, but is not limited to, fence repair, cattle branding, tagging cattle, cattle drives, and stacking hay. Plaintiffs and the putative class members never received any compensation for their work for Plaintiff Judith Jefferis or Rock Creek Ranch.

57. At all times, Defendant Owners engaged in a recruitment scheme, whereby enticing parents of troubled minor teenagers across the United States and World to pay substantial sums of money under the guise that their children would receive cutting edge residential treatment, therapy, and continuing education. Defendant Owners failed to provide the requisite treatment, therapy, continuing education, or even basic human necessities[16].

---

[16] Plaintiffs and the putative class members were not even provided a restroom in their sleeping cabin at either facility. Plaintiffs and the putative class members were punished if they attempted to use the restroom at night. Class

58.     Defendant Owners developed a relationship with Touchdown, Inc. a transport agency which, if used, would enter a class member's home in the middle of the night and legally abduct a minor child to transport them across the United States to Wyoming to force their labor to be used for the benefit or profit of Defendants. Class members would routinely have a medical or cement boot placed on their foot and leg or another apparatus to hinder their possibility of an escape.

59.     Defendant Trinity Owners and their agents developed and implemented a six (6) level system that was required to be completed to obtain discharge from TTS. Defendant Triangle Owners developed and implemented a two (2) level system that required obedience to obtain slightly improved food, clothing, and basic housing[17]. Defendant Owners and/or their agents began the systematic control of Plaintiffs and the putative class members by the threat of further confinement unless Plaintiffs and the putative class members completed all chores and ranch duties from day one. If Plaintiffs or putative class members failed to complete a single physical labor duty or chore, regardless of the reason, they would be subjected to a decrease in their level designation, which would lead to months of continued forced labor.

---

members were often forced to urinate on themselves in the middle of the night to avoid receiving a harsh punishment. Plaintiffs were limited to irregular five (5) minute showers, rarely more than every three (3) to four (4) days, for the vast majority of their time at both facilities. This led to constant UTIs, infections, and illnesses at TTS which were untreated because TTS had no medical physicians on staff. One class member was head butted by a horse, lost consciousness, chipped a tooth, and was never taken to a medical provider, despite requesting treatment. That same girl developed frost bite on her toes and TTS failed to take her to a doctor for months. Severe burns were common occurrences that were left untreated.

[17] When Plaintiffs and putative class members were upgraded to the Bunkhouse level they would have indoor plumbing, insulation, heat, and air.

60. Following introductions on their first day, Plaintiffs and the putative class members at TCR would immediately begin their forced labor for Defendants, while Plaintiffs and the putative class members at TTS immediately began their forced labor for Defendants for physical tasks not requiring the completion of the Ranch Safety Test.

61. After day one, Plaintiffs and the putative class members at TTS would begin studying for the Ranch Safety Test all day, every day, until they passed in order for the Plaintiffs' and putative class members' labor to be fully exploited by Defendant Trinity Owners. During this time of focused study on the Ranch Safety Test, Plaintiffs and the putative class members at TTS received no residential treatment other than a single weekly meeting with a counselor and received no educational training related to school. Even after passing the Ranch Safety Test, Plaintiffs and the putative class members at TTS received no instructions from a certified educational teacher during crucial years of their educational development. Defendant Owners provided between zero and two hours of education daily which consisted only of online videos and coursework, not instructed by an in-person teacher[18].

62. Plaintiffs and the putative class members conducted manual labor every day during their stay. The manual labor they performed varied daily but lasted the vast majority of the day

---

[18] While it was possible to send a direct message to an instructor when a question regarding course work arose, using direct communication through the program's chat function would lead to immediate physical punishment. Plaintiff Nash avers that she witnessed another girl request assistance once and that girl was punished with 100 step ups and placed on a watch list to prevent her from messaging the instructor again. Additionally, no classwork completed by the class members was transferable and often class members had to repeat grades after leaving TCR and TTS.

and included the following: mucking out livestock stalls[19], irrigation, fixing damaged fence posts and restoring barbed wire fences on TTS and surrounding ranches, cleaning up after church events, cleaning multiple office buildings at TTS, cleaning all ranch equipment such as feeders, corrals, and troughs daily, cleaning the steel barn and animal barns, grooming all animals (cows, sheep, pigs, horses, dogs, goats, chickens, and cats) daily, physical animal showmanship, managing the fires at the ranch, splitting fire wood, cooking all meals, doing all laundry, and cleaning all dishes for staff and other class members, cleaning all living areas, and being forced to wash the feet of staff and other class members nightly.

63.     Without proper training or oversight, the girls were forced to play an integral role in the lambing and calving operations, including the late night and early morning checks during the heart of winter. This included "preg checks," putting their arms elbow deep into the birth canal of livestock to check for a fetus, providing medical attention to all animals, including, but not limited to, lancing cysts on animals, tending to bloody, injured animals without gloves or proper safety equipment, providing animals with vaccines and medications, castrating animals, and de-tailing lambs, and other tasks that should be performed by an experienced ranch hand, not an untrained, unsupervised teen with no prior farm or ranch experience. Plaintiffs and the putative class members faced consequences if they refused to complete any of the tasks assigned to them.

---

[19] This was often referred to as the "Shrek Buffet" challenge. Girls would be forced to shovel a certain amount of manure by themselves for four hours straight. This occurred for some girls daily for months on end.

64.     Defendants TTS, TCR, and Defendant Owners and/or their agents used or threatened food and sleep deprivation, physical punishment, emotional abuse, and humiliation daily to ensure compliance with the labor requirements.

65.     Plaintiffs and the putative class members felt as though they had no other choice but to continue working for Defendants because any refusal or minor infraction would result in a decrease in level classification, which caused additional months of forced labor, food or sleep deprivation, physical[20] or emotional punishment, or humiliation.

66.     Defendant Owners coordinated for the use of Plaintiffs' and the putative class members' labor to provide weekly cleaning and event set up services for the local churches and facilities owned by both Defendant Diocese of Cheyenne and Defendant SOLT.

67.     Specifically, *inter alia,* Plaintiff Sherman was forced to provide cleaning services at the Our Lady of the Valley Church located at 35 Road 1AFW in Clark, Wyoming.

68.     Plaintiff Sherman was compelled to perform these services against her will and with the specific threat of punishment if she did not comply.

69.     Plaintiff Sherman and numerous other putative class members performed these services with numerous other putative class members throughout the duration of all of her time under the control of Defendant TTS.

---

[20] The physical punishment that Plaintiffs and the putative class members at TTS would suffer included, but was not limited to, running miles on uneven terrain regardless of physical condition or weather, running up the "hill" which was covered with sharp rocks and rattle snakes, increased ranch duties or chores, reduced rations, sleep deprivation, and shoveling manure for hours at a time. The physical punishment that Plaintiffs and the putative class members at TCR would suffer included, but was not limited to, actual assault and battery,

70.     Plaintiff Gozun provided substantially similar services to those of Plaintiff Sherman.

71.     Defendant Angela Woodward expressly confirmed in staff letters to Plaintiff Gozun's mother that Plaintiff Gozun provided cleaning services to the church.

72.     Through its officers and/or agents, the Diocese of Cheyanne had direct knowledge of the fact that the putative class members were providing compulsory labor to the Diocese at the Our Lady of the Valley Church without compensation and without the choice not to do so. Plaintiff Sherman specifically avers that three separate priests and one deacon were aware of the facts set forth above.

73.     Specifically, but without limitation, agents of the diocese known to Plaintiff Sherman as "Father Vaski," "Father Dennis," "Deacon Jerry," and a Nigerian priest whose name Plaintiff Sherman cannot recall but who will be identified in discovery each knew of every fact complained of herein that makes reference to the Our Lady of the Valley Church or the Diocese. In the alternative, at a minimum, these agents were aware of the status of the putative class members as minors in the custody of a for-profit corporation, that they were not being compensated for their labor, and that the putative class members were subject to harsh punishments. On information and belief each of these individuals is an agent of the Diocese.

74.     On information and belief, the priests are additionally culpable in that putative class members of the Catholic faith made confession to the priests and disclosed the circumstances of their captivity and abuse.

75. The Our Lady of the Valley Church specifically notes on its website that it is under the direction of Bishop Vernon Clark, the bishop of the Diocese of Cheyanne, and, therefore, on information and belief, the Diocese directly benefited from Plaintiffs' and the putative class members' labor.

76. Defendant Gerald Schneider's son and Defendant Angela's brother, Fr. Daniel Schneider, is the registered agent and President of Defendant Monks of the Most Blessed Virgin Mary of Mount Carmel, who also do business as Mystic Monk Coffee. Fr. Daniel Schneider would arrive at TCR and request from his father, Defendant Gerald Schneider, labor that was needed at The Monastery and he would transport TCR residents for forced labor at The Monastery. Quite often Fr. Daniel Schneider would deliver pressure washers and other machines requiring small engine repair for boys assigned to mechanical work at TCR to complete at the Triangle Cross Ranch.

77. Specifically, but without limitation, Plaintiff Jelinek and other putative class members performed substantial mechanical and construction labor at The Monastery, actually building the physical infrastructure and buildings on its grounds. This work was performed without remotely adequate safety precautions. For example, putative class members would perform work on buildings as high as forty (40) feet without safety harnesses or hard hats. Putative class members performed labor that should have been performed by skilled tradesmen in compliance with OSHA safety standards. Instead, The Monastery and its funding arm, The Foundation, utilized the coerced child labor of the putative class members in constructing The Monastery's physical infrastructure.

78. Defendant Daniel Schneider is an agent and officer of the Monks of the Most Blessed Virgin Mary of Mount Carmel and had direct knowledge that the putative class members were providing uncompensated labor to The Monastery and specifically knew that they faced punishment if they did not perform such services.

79. Fr. Maroney is the Secretary and Director of the Monks of the Most Blessed Virgin Mary of Mount Carmel and is also a board member of the Foundation and is its registered agent. "Br. Simon Mary of the Cross" is also a board member of the Foundation and a lay brother at The Monastery. At all times relevant to this Complaint, Fr. Maroney, Br. Simon Mary, and/or another similarly situated agent of The Monastery or The Foundation knew or in the exercise of reasonable diligence should have known that the putative class members were providing labor to The Monastery and Foundation, that the labor was not compensated, and that the putative class members faced punishment if they did not provide such labor.

80. The New Mount Carmel Foundation specifically states on its website that, "The New Mount Carmel Foundation, Inc. was organized to serve the temporal needs of the Monks of the Most Blessed Virgin Mary of Mount Carmel by bringing together donations from disparate sources and facilitating the purchase and development of a new monastery for this rapidly growing community of young Monks." On information and belief, this is a true statement, and the Foundation is the primary source of support for The Monastery, especially The Monastery's construction projects, thereby benefitting financially from each and every hour of labor provided by the putative class members.

81.     Prior to the filing of this lawsuit, The Foundation maintained a far more detailed website. After the filing of the original Complaint in this lawsuit, the Foundation removed the majority of its website from the internet, replacing it with a one paragraph description of its purpose that attempts to paint the Foundation as a land holding company. The new website contains this explicit disclaimer, "New Mount Carmel Foundation, Inc. has no financial relationship or legal obligation to any other entity." This, however, is a fraudulent statement and was an intentional attempt at concealing statements on the Foundation's website that directly link it financially to The Monastery itself.

82.     Plaintiffs preserved a copy of the original website, which contains, *inter alia,* the following relevant statements:

>     (a)     "(T)he Board of Directors is presently completing the installation of infrastructure and design preparations on the monastery complex as plans are being made to break ground in the near future."
>
>     (b)     "[T]he Foundation presently works to construct a monastery for the protection and preservation of the Carmelite monastic life."
>
>     (c)     "By ensuring the building of the monastic structures necessary for the temporal needs of the monks, these Carmelites will be able to live their life of worship and sacrifice."

83.     A specific reference on the website as it stood prior to the filing of this lawsuit should be of particular interest to the Court. Br. Simon Mary, the chair of The Foundation, had a biography on The Foundation's website (now removed) where he specifies: "Br. Simon Mary had extensive experience in the legal profession at the New England law firm of Donovan & O'Connor, LLP where he was preparing to challenge the Vermont Bar Exam. Br. Simon Mary brings selfless determination and zeal to the Foundation, whether raising funds or managing the Foundation's

current assets. He is particularly concerned with protecting each and every donation received and making decisions only after seeking heavenly guidance; his greatest aspiration is to serve the Lord with loving fidelity in all things."

84. Put simply, Br. Simon Mary, who was aware of the labor provided by the putative class members and the circumstances under which they provided it was not merely directly in control of The Foundation's finances, he was also possessed of sufficient legal education and experience that he knew or should have known that attempts at spoliation of evidence, such as the removal and/or alteration of relevant information from the website of a defendant in a lawsuit, is both unethical and unlawful.

85. The Foundation is organized as a tax exempt 501(c)(3) organization. As such, The Foundation must file IRS Form 990 annually.

86. During the period for which such forms are on file, 2014-2018, The Foundation informed the IRS that its purpose was "To serve the temporal needs of the Monks of the Most Blessed Virgin Mary of Mount Carmel by Bringing Together Donations from Disparate Sources and Facilitating the Purchase and Development of a New Monastery for this Rapidly Growing Community of Young Monks."

87. Further, The Foundation, contrary to its assertion, does have a direct financial relationship to the Monks of the Most Blessed Virgin Mary of Mount Carmel, as its financial support of that organization, a Wyoming religious corporation, is its sole legal justification for tax exempt status.

88.     Based on this document, filed with the IRS under penalty of perjury, The Foundation specifically exists to provide for the material needs of The Monastery and to conduct the ongoing construction projects at The Monastery for which Fr. Daniel Schneider specifically procured the services of the putative class members.

89.     The Foundation, therefore, derived specific fiscal benefit from the coerced labor of the minor children comprising the putative class, and agents of both The Monastery and The Foundation were directly aware of the fact that this child labor was both coerced and uncompensated.

90.     These IRS Forms 990 are executed by Fr. Nicholas Maroney as "President." The most recent filing in Plaintiffs' possession was executed by Fr. Maroney just over one year prior to the filing of this suit, on November 5, 2019. This is of specific interest because as of the time of the filing of these Forms 990, Fr. Maroney was the President of the Monks of the Most Blessed Virgin Mary of Mount Carmel and was only a board member of The Foundation.

91.     Accordingly, the operation of The Monastery and The Foundation are directly intertwined by Fr. Maroney who was acting in a leadership capacity for both The Foundation and The Monastery and had direct and personal knowledge of the use of the putative class members as coerced labor in the construction of The Monastery's physical buildings.

92.     As of the end of FY 2018, The Foundation possessed $29,408,417 in net assets.

93.     These assets were primarily garnered from cash donations made during the preceding five years. These donations totaled $2,220,749 in 2018, $1,623,348 in 2017, $4,268,896 in 2016, $6,802,372 in 2015, $3,079,562 in 2014, and $2,196,333 in 2013.

94.     On information and belief, substantial portions of these assets are the direct contributions of the Schneider and Woodward Defendants and were received by The Foundation with the knowledge of certain of its board members that the source of the donations were the profits from TCR and TCS through the unlawful coerced labor of children.

95.     Despite attempting to claim that it is merely a land holding company with no financial or legal connection to any other entity, as of 2013, the first year for which Plaintiffs have tax documents, The Foundation already possessed net assets of $11,633,133. The majority of these assets were not land or buildings, but were capitalized portions of an ongoing, long-term construction project.

96.     This ongoing, long-term construction project was among the projects on which class members were employed at The Monastery for the financial benefit of both The Monastery and The Foundation.

97.     Far from being the land holding company that The Foundation attempts to paint itself as in its Fed. R. Civ. P. 12(b)(6) motion, to which this Amended Complaint is filed in response, as of 2013 The Foundation reported land and building assets worth $4,467,079. As of the end of FY 2018, The Foundation reported that those assets had depreciated in value to $4,446,565.

98.     The majority of The Foundation's other assets are reported on each of its Forms 990 as "Construction in Progress," and despite years of construction, The Foundation has not yet realized one dollar of appreciation in the value of its buildings, instead continuing to capitalize the assets as though it were a land developer operating on a long-term construction contract.

99.     In 2014 The Foundation reported reasonable costs for the construction of land improvements ($168,422), a gas line ($53,668), and a water well ($30,855).

100.     In 2014 The Foundation reported capitalized architecture fees of $7,165,231.

101.     In 2015 The Foundation's reported figure for capitalized architecture fees increased to $12,993,608.

102.     In 2015 the only increase in value to the other "construction in progress" items was the increase in the capitalization of the gas line to $217,830. For the remaining years, The Foundation capitalized all of its "construction in progress" as a single lump sum and claimed absolutely no increase to the value of its buildings or land.

103.     Architecture expenses typically encompass no more than 12% of the cost of a building project. That percentage decreases as the cost of the building project escalates, and a floor of 6.5% is the industry standard. This suggests that The Foundation claims to be constructing a complex that will ultimately cost approximately $200 Million Dollars, at a minimum.

104.     Payment of millions of dollars in architect's fees in advance of construction is also practically unheard of within the construction industry. Architectural fees are nearly always paid on a schedule periodically at different phases of construction.

105.     However, despite architect's fees in excess of $12 Million, The Foundation has, as of the end of FY 2018, reported $23,640,759 of total construction costs, indicating that over 50% of all of the capitalized value of its construction was in architect's fees.

106.    While The Foundation's reporting of its assets and the expenditure of its income are technically *possible*, they are not plausible and give rise to a reasonable inference that The Foundation is engaged in unlawful financial activities.

107.    Further, given the fact that The Foundation has attempted to conceal information about its board, its activities, and its purpose through the radical alteration of its website immediately following the filing of this lawsuit, this Court may reasonably infer that The Foundation is engaged in activities that link it to the criminal enterprise described herein.

108.    On information and belief, The Foundation is not actually in possession of tens of millions in "construction in progress," certainly not incurred as legitimate "architect" fees but is actually either in possession of assets belonging to the Schneider and Woodward Defendants who are utilizing The Foundation, with the aid and assistance of Fr. Daniel Schneider and The Monastery, to conceal their assets by inaccurately reporting those assets as capitalized "construction in progress."

109.    In the alternative, on information and belief, the obviously inflated "architect" fees represent money received from the Schneider and Woodward Defendants and managed by Fr. Daniel Woodward in his capacity as treasurer and subsequently president of The Monastery that were passed through The Foundation and/or The Monastery in order to engage in tax avoidance or in an effort to conceal the profits of TCR and TTS.

110.    Accordingly, Defendants Fr. Daniel Schneider, The Foundation, and The Monastery are active participants in a scheme to profit directly from the illegal activities of Defendants TCR and TTS both by utilizing the coerced labor of the children kept at these facilities

and by working with them to conceal the profits unlawfully made through this criminal enterprise. In exchange The Monastery and The Foundation receive free labor and, on information and belief, substantial financial assets for the construction and operation of The Monastery's physical buildings and the "temporal needs" of the monks themselves.

111.     Additionally, upon information and belief, Defendant Trinity Owners' children, Defendants Kara Woodward and Kyle Woodward, became active employees of TTS and at all times benefitted from the forced labor and human trafficking executed by Defendant Owners and TTS.

112.     Additionally, upon information and belief, Defendant Triangle Owners' children, Defendants Mathew Schneider and Mark Schneider, became active employees of TCR and at all times benefitted from the forced labor and human trafficking executed by Defendant Owners and TCR.

**B.      Violations of the named Plaintiffs' Rights.**

**i.      Plaintiff Sherman**

113.     Plaintiff Sherman was a resident at TTS on two separate occasions. Her first stay began May 2012 and lasted until July 2013. Her second stay began July 2014 and lasted until October 2015.

114.     A non-exclusive list of examples of the labor Plaintiff Sherman was forced to complete is as follows:

(a)      Cooking for twenty (20) people daily;

(b)      Shoveling manure for four hours a day every day by herself for a month and a half;

(c)      Picking rocks for multiple hours a day during the summer;

(d)      Completed hay runs and manually loading and unloading hay trucks every week and a half in the winter months;

(e)      Running irrigation pipes for multiple hours a day during the summer;

(f)      Frequently, but at irregular dates and times, fixing broken fencing and barbed wire;

(g)      Cleaning all ranch equipment daily, year round;

(h)      Cleaning office buildings, several daily, year round;

(i)      Cleaning steel barn and animal barns, daily;

(j)      Shoveling manure, daily;

(k)      Lambing shifts, every night in the winter months;

(l)      Feeding all animals (cows, sheep, pigs, horses, dogs, goats, chickens, cats), daily;

(m)      Grooming all animals (cows, sheep, pigs, horses, dogs, goats, chickens, cats), daily;

(n)      Providing medical attention to all animals, daily;

(o)      Cleaning ranch vehicles when forced;

(p)      Animal husbandry on Defendant Owners' children's 4H sheep;

(q)      Cleaning at MMC; and

(r)      Installing fencing at the direction of TTS or its agents at Maci Lucht's family ranch, the E.O. Bischoff Ranch (hereinafter "Bischoff Ranch"), in July of 2014 for an average of six hours a day for six straight days, despite her parents being informed she was on a camping trip.[21]

---

[21] Upon information and belief, these weeklong trips to the Bischoff Ranch were annual trips for other putative class members. Shareholders and employees of the Bischoff Ranch at all times knew Plaintiff Sherman and other putative class members were patients of TTS and their labor was forced. Additionally, Maci Lucht was a staff member at

115.   Plaintiff Sherman's forced labor occurred at TTS, Rock Creek Ranch, Bischoff Ranch, Our Lady of the Valley Church, The Monastery at which Defendant MMC was located, and the community recreation center.

116.   Plaintiff Sherman suffered mild frostbite on her fingers and still has capillary damage. She suffered multiple twisted ankles, ingrown toenails, yeast infections[22], lice, and she sustained injuries from falling on a cactus after being forced to run the hill. She did not receive medical treatment for her frostbite, first twisted ankle, first ingrown toenail, any yeast infections, lice, or lacerations from falling on rocks and cacti. She received medical treatment for the second ingrown toenail, but only after six weeks. She lost the toenail because of the medical treatment delay[23]. Plaintiff Sherman was routinely denied access to a restroom or latrine such that she was sometimes forced to urinate on herself while performing labor. When she did this, TTS staff would force the other residents to ridicule her while pointing and laughing.

117.   Plaintiff Sherman was coerced into performing the labor in question by coercion within the meaning of 22 U.S.C. § 7102 through threats of serious harm to or physical restraint and through a scheme, plan, or pattern intended to cause her to believe that failure to perform an

---

TTS between July 2013 and her wedding in 2015. Maci Lucht is a shareholder of the Bischoff Ranch.

[22] Plaintiff Sherman avers she only developed yeast infections occasionally on her first stay at TTS. However, she received them bi-monthly her entire second stay at TTS because the generator and washing machine kept breaking so class members could not shower and had no clean clothes for periods of time as long as two weeks at a time.

[23] Plaintiff Sherman attempted to document injuries with a disposable camera Defendant TTS staff provided her. However, Defendant TTS's staff would confiscate any pictures of her injuries after the disposable camera film was developed.

act would result in serious harm or physical restraint. Specifically, Plaintiff Sherman was threatened with, *inter alia*,:

(a)     Not being allowed to progress through the "levels" and thereby leave TTS;

(b)     Being made to perform additional labor;

(c)     Being made to perform even more undesirable tasks like shoveling manure;

(d)     Being forced to subsist on a diet of only half a can of cold kidney beans and half a can of olives for every meal;

(e)     Being forced to run "the hill," which was a dangerous, rocky, and steep hill inhabited by rattlesnakes on which she and others routinely injured themselves;

(f)     Being forced to sit in a chair staring at a wall for extended periods of time, sometimes many hours, weeks, or months;

(g)     Being deprived of sleep;

(h)     Being forced to wear signs around her neck containing humiliating statements;

(i)     Being subjected to verbal, psychological, and emotional abuse; and

(j)     When Plaintiff Sherman's mother[24] attempted to intervene on her behalf Angela Woodard contacted the department of children's services in her home state and made allegations[25] of abuse against her in order to undermine her credibility and to continue coercing labor from Plaintiff Sherman. This action constitutes coercion through abuse of the legal process in violation of 22 U.S.C. §7102(1) & (3)(c).

## ii.     __Plaintiff Gozun__

---

[24] Plaintiff Sherman's mother did not have the custodial right to remove Plaintiff Sherman from TTS.

[25] Plaintiff Sherman avers these allegations were true. However, Plaintiff Angela has knowledge about the abuse for two (2) years and never reported it. Defendant Angela Woodward only reported the abuse when Plaintiff Sherman's mother began advocating for the proper treatment and release of her daughter from TTS.

118.    Plaintiff Gozun was a resident at TTS on one occasion. Her stay began February 2, 2012 and lasted until August 1, 2012.

119.    Plaintiff Gozun's labor list[26] substantially mirrors Plaintiff Sherman's list.

120.    Plaintiff Gozun's forced labor occurred at TTS, Rock Creek Ranch, the local Catholic Church, Our Lady of the Valley Church, The Monastery, and the community recreation center.

121.    Plaintiff Gozun's stay was shorter than the typical class member's stay. Despite being informed by Plaintiff Gozun of her prior ankle surgeries and that she couldn't run on uneven ground, Plaintiff Gozun was forced to run miles over the rough terrain for her first month until her mother confronted TTS on the topic. Plaintiff Gozun frequently rolled her ankle during her stay at the ranch and was still required to continue hard labor, including, but not limited to running heavy irrigation pipes through uneven terrain. Additionally, Plaintiff Gozun suffered frequent burns and cuts from working the ranch and would be punished for becoming injured. Finally, Plaintiff Gozun suffered frequent UTIs from what she believes in the combination of holding her urine at night and the lack of adequate showers. Plaintiff was diagnosed with Hydronephrosis, which is often referred to as "Pilot's Bladder" from holding her urine. The only time she was required to hold her urine in her life was when she was at TTS. Finally, upon her release from TTS she was diagnosed with PTSD.

---

[26] Additionally, Plaintiff Gozun was required to chop fire wood with an axe and participate in the "Fire Challenge" for weeks at a time where it was her responsibility to ensure the fire continued throughout the night which caused her to be sleep deprived.

122.    Plaintiff Gozun was coerced into performing the labor in question by coercion within the meaning of 22 U.S.C. § 7102 through threats of serious harm to or physical restraint and through a scheme, plan, or pattern intended to cause her to believe that failure to perform an act would result in serious harm or physical restraint. Specifically, Plaintiff Gozun was threatened with, *inter alia*:

(a)    Not being allowed to progress through the "levels" and thereby leave TTS;

(b)    Being made to perform additional labor;

(c)    Being made to perform even more undesirable tasks like shoveling manure;

(d)    Being forced to subsist on a diet of only half a can of cold kidney beans and half a can of olives for every meal;

(e)    Being forced to run "the hill," which was a dangerous, rocky, and steep hill inhabited by rattlesnakes on which she and others routinely injured themselves;

(f)    Being forced to sit in a chair staring at a wall for extended periods of time, sometimes many hours;

(g)    Being deprived of sleep;

(h)    Being forced to wear signs around her neck containing humiliating statements; and

(i)    Being subjected to verbal, psychological, and emotional abuse.

### iii.    <u>Plaintiff Nash</u>

123.    Plaintiff Nash was a resident at TTS on one occasion. Her stay began May 7, 2015 and lasted until November 2015.

124.    A non-exclusive list of examples of the labor Plaintiff Nash was forced to complete is as follows:

(a) Cleaning[27] and laundry in all cabins, daily for three (3) separate two (2) week periods between May 2015 and November 2015;

(b) Cooking[28] for twenty (20) people daily for three (3) separate two (2) week periods between May 2015 and November 2015;

(c) Shoveling mostly sheep feces for multiple hours a day every day from May 2015 until November 2015;

(d) Completed hay runs and manually loading and unloading hay trucks during July 2015 for approximately one (1) week;

(e) Running irrigation pipes[29] for multiple hours a day from June 2015 until August 2015;

(f) Picking rocks for multiple hours a day during the summer;

(g) Plaintiff Nash was a member of the dead animal disposal team and was responsible for transporting deceased animals to the dead animal pit without any training, supervision, or safety equipment such as masks or gloves; and

125. Plaintiff Nash's forced labor occurred predominately at TTS.

---

[27] Plaintiff Nash avers that all cleaning had to be done prior to bed and she could not go to sleep unless her tasks were completed. She had to clean a single pan for approximately three (3) hours one night even though the pan had reached the end of its life span. She would suffer physical punishment if she failed to or refused to complete her cleaning chores timely. At all times, the fear of having her level dropped to continue her imprisonment was also present. During this time she was also responsible for cleaning all the toilets and showers.

[28] Plaintiff Nash avers that without any training or food ordering experience she was required to calculate the Sysco food order based off portion sizes for all girls present during her time and staff members. Without any supervision she executed a nearly perfect Sysco food order, only ordering a single additional can of tomato sauce. She was forced to run the dangerous hill as physical punishment for nearly being perfect in a task that she received no training or supervision. Defendant Trinity Owners followed a strict portioning guideline providing each girl with the exact same amount of substandard food. In the event food handler exceeded the exact food proportions they were physically punished.

[29] Plaintiff Nash avers that she suffered cuts on her legs and arms from the irrigation pipes. She was designated the leader operating the dangerous high-pressure connections of the irrigation pipes without training or supervision.

126.    Plaintiff Nash was assigned the duty of taking care of full-size goat for a three-month[30] period during the summer of 2015. This care consisted of daily feeding, cleaning, mucking out its cage, walking it to and from her school classes and overall being responsible for the goat for 24 hours a day. Plaintiff Nash had no previous animal handling experience. The goat would quite often drag her, headbutt her, and bite her. On multiple occasions she informed staff of the physical injuries she was suffering from the animal and was dismissed, humiliated, and belittled.

127.    For physical punishment Plaintiff Nash was forced to run up and down the small hill every morning and afternoon from May 2015 until November 2015. Plaintiff Nash was forced to run up and down the larger hillside in July 2015. She was also subjected to constant step-ups and pushups.

128.    Plaintiff Nash was under the disability of minority until November 28, 2017. Accordingly, Plaintiff Nash's statute of limitations was tolled until that date. As such she had three years from that date in which to bring state law tort claims.

129.    Plaintiff Nash specifically alleges that Defendants TTS and all of the Woodard Defendants owed her a duty of care as a child placed exclusively in their care, custody, and control. She further alleges that Defendants TTS and all of the Woodard Defendants breached that duty when they permitted TTS staff and others to subject her to the abusive conduct described above[31].

---

[30] Generally, a chore would last for approximately two weeks and then rotate to a new chore. Plaintiff Nash was told she was assigned the Goat Duty chore because the goat was stubborn, just like her.

[31] Plaintiff Nash has grown and matured since the traumatic experiences she suffered at the hands of Defendants. She is a Child Development Association Certified lead teacher dealing with toddlers. She is a mandatory reporter now and avers that she would have a legal duty to report all the events that occurred to her and other class members if she were to even catch wind of such allegations.

Further, as a direct and proximate result of said breach, Plaintiff Nash suffered damages including to include Post-Traumatic Stress Disorder and physical and psychological pain and suffering.

130.     Plaintiff Nash was coerced into performing the labor in question by coercion within the meaning of 22 U.S.C. § 7102 through threats of serious harm to or physical restraint and through a scheme, plan, or pattern intended to cause her to believe that failure to perform an act would result in serious harm or physical restraint. Specifically, Plaintiff Nash was threatened with, *inter alia*:

     (a)     Not being allowed to progress through the "levels" and thereby leave TTS;

     (b)     Being made to perform additional labor;

     (c)     Being made to perform even more undesirable tasks like shoveling manure;

     (d)     Being forced to subsist on a diet of only half a can of cold kidney beans and half a can of olives for every meal;

     (e)     Being forced to run "the hill," which was a dangerous, rocky, and steep hill inhabited by rattlesnakes on which she and others routinely injured themselves;

     (f)     Being forced to sit in a chair staring at a wall for extended periods of time, sometimes many hours;

     (g)     Being deprived of sleep;

     (h)     Being forced to wear signs around her neck containing humiliating statements; and

     (i)     Being subjected to verbal, psychological[32], and emotional abuse[33].

---

[32] The girls showered inconsistently, but rarely more than once every 3-4 days. She asked a TCS staff member, Jill, if she could use the restroom at night and was told no and belittled. Having no control over the situation she was forced to urinate on herself and had to wear her urine-soaked clothes for multiple days until it was her day to shower.

[33] Plaintiff Nash avers that changing feminine products was a major issue as staff controlled their ability to use the restroom and would routinely deny residents the ability to change their feminine products.

iv.   **Plaintiff Scavuzzo**

131.   Plaintiff Scavuzzo was a resident at TCR from April 8, 2012 until July 4, 2012.

132.   A non-exclusive list of examples of the labor Plaintiff Scavuzzo was forced to complete is as follows:

(a)   Welding for the fabrication of equipment components for TCR;

(b)   Regular roofing work and the installation of joists for the ongoing construction projects at The Monastery that inured to the financial benefit of The Foundation;

(c)   Running irrigation pipes for multiple hours a day for six days a week including but not limited to ditch irrigation, dam irrigation, and gate irrigation;

(d)   Installation of Heating, Ventilation, and Air Conditioning unit at the Our Lady of the Valley Church to the financial benefit of The Diocese;

(e)   Shoveling manure, daily;

(f)   Feeding all animals (cows, horses, and chickens), daily;

(g)   Grooming all animals, daily;

(h)   Working for Tom George's seed business, Big Horn Saindfoint; and

(i)   Providing medical attention to all animals.

133.   Plaintiff Scavuzzo's forced labor occurred at TCR and he provided construction and mechanical labor to The Monastery in support of its construction operations that inured to the financial benefit of The Foundation.

134.   Plaintiff Scavuzzo was 18 years old at the time of his stay. He was, however, not permitted to leave despite attempts to do so and attempts to contact his family in order to leave. He was then told that he would move into the "adult program," which offered better housing and

certain "privileges" such as the ability to use tobacco. In order to be "inducted" into the adult program, Plaintiff Scavuzzo was told that he would have to be branded with a cross. Under pressure from the staff and out of a desperate need for better conditions, Plaintiff Scavuzzo agreed. He was branded with a 5 inch by 4 inch cross on his right arm by two staff members. He was provided no medical care for this and the wound quickly became infected. He repeatedly requested medical care and eventually access to an emergency room, which was denied. On July 4, 2012, his mother and father came for surprise visit. Upon seeing her son's injury, his mother immediately had him gather his things and they left TCR. Plaintiff Scavuzzo's father immediately contacted a physician who was a family friend who called in a prescription ointment to the nearest pharmacy. Plaintiff Scavuzzo was promptly taken for medical care and underwent four surgeries to repair the injury.

135.    Plaintiff Scavuzzo was coerced into performing the labor in question by coercion within the meaning of 22 U.S.C. § 7102 through threats of serious harm or physical restraint and through a scheme, plan, or pattern intended to cause him to believe that failure to perform an act would result in serious harm or physical restraint. Specifically, **Plaintiff Scavuzzo** was threatened with, *inter alia*:

    (a)    Not being allowed to progress to the "Bunkhouse level" and thereby obtain basic human living standards;

    (b)    Being made to perform additional labor;

    (c)    Being made to perform even more undesirable tasks like shoveling manure;

    (d)    Being forced to subsist on an inadequate diet;

    (e)    Being deprived of sleep;

    (f)    Being deprived of basic human living needs, such as heat, air, running

water, and a mattress;

(g)     Being subjected to corporal punishment such as running up and down a hill; and

(h)     Being subjected to physical, verbal, psychological, and emotional abuse.

**v.     Plaintiff Jelinek**

136.     Plaintiff Jelinek was a resident at TCR on one occasion. His stay began mid May 2011[34] and lasted until December 20, 2011.

137.     A non-exclusive list of examples of the labor Plaintiff Jelinek was forced to complete is as follows:

(a)     Welding every day during the three (3) month harvest season;

(b)     Daily mechanical repairs to include, but not limited to, repairs on tractors, greasing vehicles, rebuilding, and installing transmissions, and repairing pressure washers. These repairs were performed on both TCR equipment and equipment used for the purpose of construction projects at The Monastery that inured to the financial benefit of The Foundation;

(c)     Running irrigation pipes for multiple hours a day for six days a week including but not limited to ditch irrigation, dam irrigation, and gate irrigation;

(d)     Constructing a 40 x 60 steel barn with no safety equipment or harnesses;

(e)     Shoveling manure, daily;

(f)     Feeding all animals (cows, horses, and chickens), daily;

(g)     Grooming all animals, daily;

---

[34] Of note is the traumatic experience Plaintiff Jelinek suffered at the hands of his transportation services which was believed to be recommended by Defendant Triangle Owners. He was placed in a cement boot and forced to wear a four point restraint consisting of a belt and attached handcuffs and ankle restraints.

 (h)      Working for Tom George's seed business, Big Horn Saindfoint; and

 (i)      Providing medical attention to all animals, daily.

138.    Plaintiff Jelinek's forced labor occurred at TCS and he provided mechanical labor to The Monastery in support of its construction operations that inured to the financial benefit of The Foundation.

139.    Plaintiff Jelinek's stay was shorter than the typical class member's stay. Despite being informed by Plaintiff Jelinek of his excruciating anal pain for months Defendant Triangle Owners forced Plaintiff Jelinek to work for months without proper medical treatment. Plaintiff Jelinek eventually required an Anal Sphincteroplasty to repair his chronic anal sphincter muscle tear. Rather than properly treat Plaintiff Jelinek, Defendant Triangle Owners attempted to medicate Plaintiff Jelinek with Diphenhydramine[35] to keep him docile. After his surgery, Plaintiff Jelinek served as Defendant Triangle Owners' personal aide during his recovery.

140.    Plaintiff Jelinek was coerced into performing the labor in question by coercion within the meaning of 22 U.S.C. § 7102 through threats of serious harm to or physical restraint and through a scheme, plan, or pattern intended to cause him to believe that failure to perform an act would result in serious harm or physical restraint. Specifically, **Plaintiff Jelinek** was threatened with, *inter alia*:

 (a)      Not being allowed to progress to the "Bunkhouse level" and thereby obtain basic human living standards or obtaining the possibility of leaving TCR early;

---

[35] Diphenhydramine is an over the counter substitute for Benadryl.  A recommended therapeutic dose is 25 – 30 mg. It is not clinically recommended to exceed 300 mg daily, yet Defendant Triangle Owners forced Plaintiff Jelinek to consume between a 200 – 300 mg morning does and a 500 – 1000 mg nightly dose.

(b)     Being made to perform additional labor;

(c)     Being made to perform even more undesirable tasks like shoveling manure;

(d)     Being forced to subsist on a diet of insects[36];

(e)     Being deprived of sleep;

(f)     Being deprived of basic human living needs, such as heat, air, running water, and a mattress; and

(g)     Being subjected to physical[37], verbal, psychological, and emotional abuse[38].

## C.     Uniform Damages to the Plaintiffs and the Class Members for Forced Labor.

141.     Plaintiffs and the putative class members have sustained damages as the result of the unlawful use of their labor proximately caused by Defendants' acts. These damages include two three types.

142.     First, Plaintiffs and the putative class members are entitled to recover restitution damages under the TVPRA at least at the prevailing wage rate. Limiting TVPRA victims to the FLSA remedy would *inappropriately* afford criminals engaged in egregious practices the benefit of the lowest common-denominator minimum wage for legitimate employers. Plaintiffs and the putative class members are entitled to compensation for services provided at the same rates

---

[36] Plaintiff Jelinek avers that he was 23 years old before he realized that most people in America had never had to eat insects. Plaintiff Jelinek recalls the flavors of different bugs that he had to consume because he and other residents were so hungry. Plaintiff Jelinek would throw up and swallow it back down just to make himself feel full. Plaintiff Jelinek lost 90 lbs. in eight (8) months going from 255 lbs. to 155 lbs. due to the malnutrition.

[37] Plaintiff Jelinek avers he was physically assaulted by Defendant TCR's agent Tom on two separate occasions.

[38] Each staff member had the discretion to punish Plaintiff Jelinek at his own discretion and staff changed often.

received by others who voluntarily provide those same services. *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1172 (D. Kan. 2018).

143.    Plaintiffs assert that each named Plaintiff and each Class Member is entitled to $16.31[39] per hour of labor for the first forty hours per week and $24.47 per hour for every hour afterwards. Plaintiffs allege that a typical day consisted of ten to twelve hours of labor, two to five hours of sham therapy and/or education, and approximately two-and-one-half hours of hygiene and meals.

144.    Upon information and belief, Plaintiffs anticipate that at least 100 Class Members were unlawfully forced to work an average of eleven-and-one-half hours per day.  Plaintiffs contend that at any given time approximately twelve girls were forced to labor at TTS or by TTS and its staff for the other Defendants.  Additionally, Plaintiffs contend that at any given time approximately twenty-three boys were forced to labor at TCR or by TCR and its staff for the other Defendants.

145.    Second, Plaintiffs and the Class Members are entitled to recover compensatory damages for emotional distress to redress noneconomic harm related to the squalid, restricted, and threatening working/living conditions imposed on TVPRA victims. Courts have awarded damages to trafficking victims subjected to forced labor in amounts ranging from $415 to $780 per day. *Id.* at 1173-74. Plaintiffs contend that they should be awarded $780 per day due to the especially vulnerable nature of the Class, all of whom were minor children suffering from mental and

---

[39] Prevailing hourly wage for farm labor based on the May 2019 Department of Labor's office of Occupational and Employment Statistics.

emotional health problems, family distress, or addiction issues that rendered them especially vulnerable to abuse. Plaintiffs and the Class seek an award of such compensatory damages in amount to be proven at the trial.

146.    Plaintiffs allege that they and the Class should also be permitted to recover any sums that TTS and TCR were paid during their residence at either TTS or TCR relative to their putative "treatment" or housing. Plaintiffs are without knowledge of the precise sums in issue, but, on information and belief, these sums ranged between $6,000 and $9,000 per month per child.

147.    Plaintiff Nash and those similarly situated have, in addition, been diagnosed with Post-Traumatic stress disorder which is the direct and proximate result of negligence described herein. Their damages, in an amount to be shown to the Court, are substantially similar as the cost of treatment and therapy for Post-Traumatic Stress Disorder is relatively uniform. The types of symptoms that she and others similarly situated experience are similar enough that the Court can effectively compensate them as a subclass. Further, due to the fact that the TVPRA damages in this case are well into the tens of millions of dollars, Plaintiffs allege that their damages would need to be recovered from limited funds of the type contemplated by the Supreme Court in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).

148.    Plaintiffs reserve the right to amend this allegation based upon the discovery that will be conducted in this action.

# V.

# CLASS ACTION ALLEGATIONS

149.    The named Plaintiffs bring this action as a Class Action pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, and pursuant to Rules 23(b)(1), 23(b)(2) and/or 23(b)(3) defines the class as follows:

> From November 27, 2010 to the present, Plaintiffs, and all similarly situated persons who were housed at either Defendant Trinity Teen Solutions, Inc. or Defendant Triangle Cross Ranch, LLC and forced to provide manual labor to one or more of the Defendants.

150.    Plaintiff Nash represents a subclass defined as:

> From November 27, 2017 to the present, Plaintiffs, and all similarly situated persons within the applicable statute of limitations who were housed at Defendant Trinity Teen Solutions, Inc. who, due to the negligence of Defendant TTS, have been diagnosed with or suffer from Post-Traumatic Stress Disorder.

151.    **Numerosity.**  The requirements of Rule 23(a)(1) are satisfied in that there are too many Class Members for joinder of all of them to be practicable.  Upon information and belief, these Class Members exceed at least 100 in number. Upon information and belief, the Subclass Members exceed at least 50 in number.  This Class and Subclass, as defined above, meet the numerosity requirement.

152.    **Commonality.**  The claims of the Class Members raise numerous common issues of fact and/or law, thereby satisfying the requirements of Rule 23(a)(2). These common legal and factual questions, which may be determined without the necessity of resolving individualized factual disputes concerning any Class Member.

153.    This action involves questions of law common to the class, including:

(i) Whether Defendants' conduct violated the forced labor and trafficking provisions of the TVPRA (18 U.S.C. §§ 1589, 1590, 1593A, and 1594);

(ii) Whether Defendants' are associated in fact and an "enterprise" within the meaning of 18 U.S.C. § 1961(4);

(iii) Whether Defendants' engaged in a pattern and practice of human trafficking and forced labor in violation of 18 U.S.C. §§ 1589 & 1590;

(iv) Whether Defendants' activities constituted a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5);

(v) Whether Plaintiffs and members of the putative class are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c);

(vi) As to the subclass, whether Defendants negligent conduct caused psychological injuries to Plaintiffs within the subclass;

(vii) Whether Defendants regularly advertised and moved goods and people across state lines and engaged in interstate commerce; and

(viii) The nature of damages available to Plaintiffs and members of the putative class, including the applicability of compensatory and/or punitive damages.

154. This action involves questions of fact common to the class, including:

(i) Whether Defendants used and/or threatened Plaintiffs and other putative class members with physical restraint, serious harm, and/or abuse of the legal process in order to obtain Plaintiffs' and other putative class members' labor or services;

(ii)     Whether Defendants' recruited, harbored, transported, obtained and/or provided Plaintiffs and other putative class members for the purpose of subjecting them to forced labor and/or involuntary servitude;

(iii)    Whether Defendants' knowingly benefitted from participating in a venture that Defendants knew or should have known was engaged in providing and/or obtaining Plaintiffs' and other putative class members' labor or services through physical restraint, serious harm, and/or abuse of the legal process;

(iv)    Whether Defendants knowingly benefitted from participating in a venture that Defendants knew or should have known was engaged in the recruitment, harboring, transporting, obtaining and/or providing Plaintiffs and other putative class members for the purpose of subjecting them to forced labor and/or involuntary servitude;

(v)     Whether Defendants used standardized recruitment, record-keeping, and employment policies and practices for Plaintiffs and putative class members; and

(vi)    The source and amount of Plaintiffs' and other class members' damages.

155.    **Typicality**.  The claim of the named Plaintiffs is typical of the unnamed Class Members because they have a common source and rest upon the same legal and remedial theories, thereby satisfying the requirements of Rule 23(a)(3). For example, the named Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all Class Members were injured or damaged by the same wrongful practices in which Defendant engaged.

156.    **Adequacy of Representation.**  The requirements of Rule 23(a)(4) are satisfied in that the named Plaintiffs have a sufficient stake in the litigation to vigorously prosecute their claims

on behalf of the Class Members and the named Plaintiffs' interests are aligned with those of the proposed Class. There are no defenses of a unique nature that may be asserted against Plaintiffs individually, as distinguished from the other members of the Class, and the relief sought is common to the Class. Plaintiffs do not have any interest that is in conflict with or is antagonistic to the interests of the members of the Class and has no conflict with any other member of the Class.

157. Further, Plaintiffs have retained competent counsel experienced in class action litigation, to represent them and the Class Members in this litigation. To wit, Plaintiffs' chosen counsel consists of:

(a)     Michael Rosenthal and Nathan Nicholas of Hathaway & Kunz, LLP are licensed members of the Wyoming State Bar in good standing and will serve as Local Counsel for this action. For more than 35 years Mr. Rosenthal's practice has primarily been focused on personal injury, representing both plaintiffs and defendants in litigation, trials and appeals. He has appeared in litigation before all of Wyoming's Federal Court Judges and Magistrate Judges, as well as in every state judicial district court. His experience includes involvement in several class action lawsuits in both federal and state courts within Wyoming. He is well-versed in local practices, rules and procedures. Mr. Rosenthal and the rest of the Plaintiffs' counsel will be assisted by Nathan Nicholas, an associate and litigator at Hathaway & Kunz, LLP.

(b)     Frank Watson of Watson Burns, PLLC has successfully prosecuted class actions in numerous matters, including, but not limited to, class action suits brought against law firms for charging and collecting unlawful fees and expenses. *See, e.g., Howard et al v. Wilkes & McHugh, P.A.*, Case No. 2:06-cv-02833-JMP-cgc (W.D. Tenn. Filed 2006)(appointing Watson Burns, PLLC

as Class Counsel and ultimately approving $4 million settlement in connection with overcharged legal fee); *Manjunatha A. Gokare, P.C. and Goldstein, Borgen, Dardarian & Ho, P.C. v. Federal Express Corporation, et al.,* Case No. 2:11-cv-2131-JTF-cgc (W.D. Tenn. Filed Nov. 11, 2011)(appointing Watson Burns co-lead class counsel representing nationwide class in breach of contract and RICO claims against international freight shipper alleging overcharging for residential delivery surcharge fees for delivers made to non-residential locations; nationwide class was certified and a settlement of $26 million was approved); *Youngblood v. Linebarger, Goggan, Blair & Sampson, LLP*, Case No. 10-cv-2304 SHM-tmp (W.D. Tenn. filed Mar 10, 2010)(Watson Burns appointed lead class counsel representing plaintiff class of 48,000 delinquent taxpayers against Texas law firm alleging that Linebarger charged and received an unlawful legal fee from taxpayers when pursuing property tax collection suits on behalf of the City of Memphis; the class was certified and ultimately settled for $7.4 million); *Ham v. Swift Transportation Co., Inc*., 275 F.R.D. 475 (W.D. Tenn. 2011)(Watson Burns appointed co-lead class counsel representing plaintiff class against national trucking company challenging the testing practices of a commercial truck driving; class-wide settlement case achieved for compensatory damages and debt write off valued in excess of $17 million).

(c)     Additionally, Plaintiffs' chosen counsel includes Brice M. Timmons of Donati Law, PLLC. Mr. Timmons is a distinguished member of the Tennessee Bar, the Memphis Bar, the Federal Bar, and the American Bar Associations. His practice focuses almost exclusively on civil rights violations committed by public and private actors specifically including municipal governments, jails, prisons, private prison contractors, and educational institutions. Mr. Timmons has significant

experience representing disabled, minor plaintiffs in suits against their caregivers and educational institutions. Mr. Timmons has handled and/or tried hundreds of cases during that time period. Mr. Timmons has also been appointed class counsel in two civil rights actions. Specifically, Mr. Timmons is class counsel in *Busby v. Bonner*, 2:20-cv-02359 (TNWD, 2020), in which, along with the American Civil Liberties Union and others, he represents a class of incarcerated persons who are especially vulnerable to COVID-19 on claims arising under various federal civil rights statutes and in which he and his co-counsel received class certification prior to ultimately negotiating the most comprehensive consent decree achieved to date in the plethora of civil rights actions brought in response to the COVID-19 pandemic's impact on jails and prisons. He has also been appointed class counsel in *Turnage v. Oldham*, 2:16-cv-02907 (TNWD, 2016) in which he represents a putative class of persons subjected to overdetention due to the employment of a faulty software package to operate the county jail and criminal courts in claims arising under 42 U.S.C. §1983 and Tennessee common law.

158.  **Predominance and Superiority.**  All of the requirements for Rule 23(b)(3) are satisfied because the common factual and legal issues identified above are sufficiently cohesive to warrant adjudication by representation.  In particular, the Plaintiffs and the Class Members have suffered a common cause of injury, namely the forced labor of Plaintiffs and the Class Members, caused by the common course of conduct engaged in by Defendants. The Class Members' legal claims arise under 18 U.S.C. § 1581 *et seq.* and 18 U.S.C. § 1961 and Wyoming law and, therefore, do not involve the application of other states' laws which may have varying degrees of liability and proof. Class action treatment is also superior to other available methods for the fair and

efficient adjudication of this controversy, because individual litigation of the claims of all Class Members is economically unfeasible and procedurally impracticable. The likelihood of individual Class Members prosecuting separate claims is remote and, even if every Class Member could afford individual litigation, the court system would be unduly burdened by individual litigation in such cases. Additionally, individual litigation would also present the potential for varying, inconsistent or contradictory judgments while magnifying the delay and expense to all parties and to the court system, thus resulting in multiple trials of the same legal issue and creating the possibility of repetitious litigation. *Zuccarini v. Hoechst (In re Cardizem CD Antitrust Litig.)*, 200 F.R.D. 326, 335 (E.D. Mich. 2001)("Differences in damages sustained by individual class members does not preclude a showing of typicality nor defeat class certification"); *Bremiller v. Cleveland Psychiatric Inst*., 898 F. Supp. 572, 579 (N.D. Ohio 1995)("The above-cited caselaw demonstrates that the existence of individual damages is not enough to defeat class certification on the commonality element. Therefore, the court declines to decertify the class on this basis") As a result, the desirability to concentrate litigation in this forum is significantly present. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. Relief concerning Plaintiffs' rights under the laws herein alleged and with respect to the Class would be proper.

**VI.**

## CAUSES OF ACTION

## COUNT 1 – CIVIL ACTION UNDER FEDERAL LAW FOR FORCED LABOR
## 18 U.S.C. § 1589(a)

**(AGAINST DEFENDANTS TTS, TCR, GERALD SCHNEIDER, MICHAELEEN SCHNEIDER, ANGIE WOODWARD, JERRY WOODWARD, DANIEL SCHNEIDER, MATHEW SCHNEIDER, MARK SCHNEIDER, KARA WOODWARD, AND KYLE WOODWARD)**

159.   Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

160.   Pursuant to 18 U.S.C. § 1595(a), Plaintiffs and members of the putative class are entitled to bring a civil action against the perpetrator (or whoever knowingly benefits financially or by receiving anything of value from participating in a venture which that persons knew or should have known engaged in an act in violation of 18 U.S.C. § 1581 *et seq*.

161.   Defendants knowingly provided or obtained the labor services of Plaintiffs and members of the putative class by means of force, threats of force, physical restraint, or threats of physical restraint in violation of 18 U.S.C. § 1589(a).

162.   Defendants knowingly provided or obtained the labor services of Plaintiffs and members of the putative class by means of serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a).

163.   Defendants knowingly provided or obtained the labor services of services of Plaintiffs and members of the putative class by means of a scheme, plan, or pattern intended to cause services of Plaintiffs and members of the putative class by means to believe that, if they did

not perform such labor or services, they would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a).

164.    As a result of Defendants' conduct, Plaintiffs and members of the putative class suffered economic damages, for which they should be compensated.

165.    As a result of Defendants' conduct, Plaintiffs and members of the putative class suffered emotional and physical pain and suffering for which they should be compensated.

## COUNT 2 – CIVIL ACTION UNDER FEDERAL LAW FOR FORCED LABOR 18 U.S.C. § 1589 (b)

### (AGAINST ALL DEFENDANTS)

166.    Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

167.    Pursuant to 18 U.S.C. § 1595(a), Plaintiffs and members of the putative class are entitled to bring a civil action against the perpetrator (or whoever knowingly benefits financially or by receiving anything of value from participating in a venture which that persons knew or should have known engaged in an act in violation of 18 U.S.C. § 1581 *et seq.* and may recover reasonable attorney's fees.

168.    Defendants knowingly benefitted financially and/or received things of value from participating in a venture which had engaged in the providing or obtaining of forced labor or services, knowing or in reckless disregard of the fact that the venture had engaged in the providing or obtaining of forced labor or services in violation of 18 U.S.C. § 1589(b).

169. As a result of Defendants' conduct, Plaintiffs and members of the putative class suffered economic damages, for which they should be compensated.

170. As a result of Defendants' conduct, Plaintiffs and members of the putative class suffered emotional and physical pain and suffering for which they should be compensated.

### COUNT 3 – CIVIL ACTION UNDER FEDERAL LAW FOR TRAFFICKING 18 U.S.C. § 1590(a)

### (AGAINST ALL DEFENDANTS)

171. Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

172. Pursuant to 18 U.S.C. § 1595(a), Plaintiffs and members of the putative class are entitled to bring a civil action against the perpetrator (or whoever knowingly benefits financially or by receiving anything of value from participating in a venture which that persons knew or should have known engaged in an act in violation of 18 U.S.C. § 1581 *et seq.* and may recover reasonable attorney's fees.

173. Defendants knowingly recruited, harbored, transported, provided, and/or obtained by any means Plaintiffs and members of the putative class for their labor or services in violation of 18 U.S.C. § 1590(a).

174. Defendants knowingly benefitted financially and/or by receiving things of value from participating in a venture which engaged in the trafficking of forced labor by any of the means described herein, knowing or in reckless disregard of the fact that the venture was engaged in the trafficking of forced labor or services by any of such means.

175.     As a result of Defendants' conduct, Plaintiffs and members of the putative class suffered economic damages, for which they should be compensated.

**COUNT 4 – CIVIL ACTION FOR VIOLATION OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. S 1961 *ET SEQ.***

**(AGAINST DEFENDANTS TTS, TCR, GERALD SCHNEIDER, MICHAELEEN P. SCHNEIDER, ANGELA WOODWARD, JERRY D. WOODWARD, DANIEL SCHNEIDER, MATHEW SCHNEIDER, MARK SCHNEIDER, KARA WOODWARD, KYLE WOODWARD, THOMAS GEORGE, JUDITH JEFFERIS, MONKS OF THE MOST BLESSED VIRGIN MARY OF MOUNT CARMEL, and the NEW MOUNT CARMEL FOUNDATION, INC.)**

176.     Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

**A.**     **Prohibited Conduct and Civil Remedies under RICO**

177.     Pursuant to 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…"

178.     Pursuant to 18 U.S.C. § 1964(c) "any person injured in his business or property by reason of a violation of section 1962 of [RICO] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee…"

179. The essential elements of a civil RICO claim require that the plaintiff plausibly allege that each defendant (1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity.

180. As alleged herein, Defendants Gerald Schneider, Michaeleen P. Schneider, Angela Woodward, Jerry D. Woodward, Daniel Schneider, Mathew Schneider, Mark Schneider, Kara Woodward, Kyle Woodward, Thomas George, Judith Jefferis (hereinafter referred to collectively as the "Individual RICO Defendants") each conducted the affairs of TTS and TCR through a pattern of racketeering activity by repeatedly violating 18 U.S.C. §§ 1589 & 1590.

181. Defendants Monks of the Most Blessed Virgin Mary of Mount Carmel and New Mount Carmel Foundation, Inc., by and through their agents Daniel Schneider and Nicholas T. Maroney, did conduct the affairs of those organizations through a pattern of racketeering activity by repeatedly violating 18 U.S.C. §§ 1589 & 1590.

182. Each of the Individual RICO Defendants constitute a "person" within the meaning of 18 U.S.C. § 1961(3).

**B. The RICO Enterprises**

183. TTS is a corporation which is distinct, separate and apart from the Individual RICO Defendants and thus constitutes a RICO "enterprise" within the meaning of 18 U.S.C. § 1961(4).

184. TCR is a limited liability company which is distinct, separate and apart from the Individual RICO Defendants and thus constitutes a RICO "enterprise" within the meaning of 18 U.S.C. § 1961(4).

185.    Defendant Monks of the Most Blessed Virgin Mary of Mount Carmel is a Wyoming Religious Corporation which is distinct, separate and apart from the Individual RICO Defendants and thus constitutes a RICO "enterprise" within the meaning of 18 U.S.C. § 1961(4)

186.    Defendant New Mount Carmel Foundation, Inc. is a not-for-profit corporation which is distinct, separate and apart from the Individual RICO Defendants and thus constitutes a RICO "enterprise" within the meaning of 18 U.S.C. § 1961(4).

187.    Pleading in the alternative, the Individual RICO Defendants in combination with Defendants TTS, TCR, The Monastery, and The Foundation formed an associated in fact enterprise (hereinafter referred to as the "Association In Fact Enterprise") and as such constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4). With respect to the Association In Fact Enterprise, Defendants TTS, TCR, The Monastery, and The Foundation all constitute a "person" within the meaning of 18 U.S.C. § 1961(3).

188.    At all relevant times as described in this Complaint, the Individual RICO Defendants have engaged in operating the affairs of TTS, TCR, The Monastery, and The Foundation for over ten (10) years for the purpose of executing essential aspects of a criminal worker exploitation scheme in violation of 18 U.S.C. §§ 1589 & 1590.

189.    Pleading in the alternative, the Individual RICO Defendants in combination with Defendants TTS, TCR, The Foundation, and The Monastery have engaged in operating the affairs of the Association In Fact Enterprise for over ten (10) years for the purpose of executing essential aspects of a criminal worker exploitation scheme in violation of 18 U.S.C. §§ 1589 & 1590.

C.    **The Pattern of RICO Predicate Acts**

190.    Defendants named herein, through TTS, TCR, The Monastery, and The Foundation and through the Association In Fact Enterprise have been engaged in the pattern and practice of human trafficking and forced labor as described in this Complaint in violation of, among other laws, 18 U.S.C. §§ 1589 & 1590.

191.    The predicate acts of criminal racketeering activity as described in this Complaint constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5). Defendants repeatedly committed the RICO predicate act of human trafficking and forced labor as alleged above and profited from same.

192.    The Defendants named herein regularly moved goods and people across state lines and therefore were engaged in interstate commerce.

**D.      Continuity of the Criminal Activity**

193.    The Defendants' pattern of racketeering activity alleged above has lasted in duration since at least 2012, injuring hundreds if not thousands of minors. These predicate act violations are in no way isolated nor were they directed at a small, finite number of persons. To the contrary, Defendants' predicate acts have not only continued without interruption for approximately ten (10) years or more, but their unlawful activities can and will extended to future victims unless and until they are brought to justice. Thus, the pattern of racketeering in this matter constitutes "open ended continuity."

**E.      RICO Injury to Plaintiffs and the Putative Class**

194.    Plaintiffs and members of the putative class are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c) because Defendants trafficked Plaintiffs and members

of the putative class around the United States and forced them to perform labor services without compensation.

195.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and members of the putative class are entitled to threefold the damages they sustained and the cost of the suit, including a reasonable attorney's fees.

196.    As a result of Defendants' conduct, Plaintiffs and members of the putative class suffered economic damages, for which they should be compensated.

197.    As a result of Defendants' conduct, Plaintiffs and members of the putative class suffered emotional and physical pain and suffering for which they should be compensated.

198.    Plaintiffs have stated valid claims for forced labor and human trafficking and these claims serve as underlying predicate acts for Plaintiffs' RICO claims.

199.    Alternatively, Plaintiffs have standing to bring these RICO claims because Plaintiffs were economically injured and experienced violations of Plaintiff's property in the following included, but not limited to ways: co-pays, out-of-pocket medical costs, reduced earning capacity, lost wages, incidental costs, and future medical costs including drug rehabilitation treatment, therapy, orthopedic surgery, among other economic damages to be proved at trial.

**COUNT 5 – NEGLIGENCE AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**(AGAINST DEFENDANT TRINITY TEEN SOLUTIONS, DALLY-UP, LLC, DIOCESE OF CHEYENNE, AND SOCIETY OF OUR LADY OF THE MOST HOLY TRINITY)**

200.     Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

201.     Defendants TTS, Dally-up, SOLT, and the Diocese of Cheyenne owed Plaintiff Nash and the Subclass a duty of care and did breach that duty of care through the acts complained of herein.

202.     Defendant TTS, acting through its employees and agents, by extreme and outrageous conduct recklessly caused Plaintiff Nash and others similarly situated severe emotional distress and/or bodily harm through conduct described herein that goes beyond all possible bounds of decency, is regarded as atrocious, and is utterly intolerable in a civilized community. She, and others similarly situated, suffered as distress so severe that no reasonable person could be expected to endure it and she and others similarly situated have, in fact, suffered from and required treatment for Post-Traumatic Stress Disorder..

203.     As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the putative class suffered economic damages, for which they should be compensated.

204.     As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the putative class suffered emotional and physical pain and suffering for which they should be compensated.

# VII.

## PRAYER FOR RELIEF

WHEREFORE, the named Plaintiffs and the Class Members demand judgment against Defendants Trinity Teen Solutions, Inc., Triangle Cross Ranch, LLC., Monks of the Most Blessed Virgin Mary of Mount Carmel, d/b/a Mystic Monk Coffee, Gerald ("Jerry") Schneider, Michaeleen P. Schneider, Angela ("Angie") Woodward, Jerry D. Woodward, Daniel Schneider, Mathew Schneider, Mark Schneider, Kara Woodward, Kyle Woodward, Thomas George, Judith Jefferis, Dally-Up, LLC, Rock Creek Ranch, Inc., Diocese of Cheyenne, Society of Our Lady of the Most Holy Trinity, and the New Mount Carmel Foundation, Inc., on each Count of the First Amended Complaint and pray for the following relief:

1. Issue an Order certifying that this action may be maintained as a class action, appointing Plaintiffs and their counsel to represent the Class, and directing that reasonable notice of this action be given by Defendants to all Class Members;

2. Grant any reasonable request to Amend Plaintiffs' Class Action Complaint to conform to the discovery and evidence obtained in this Class Action;

3. Empanel a jury to try this matter;

4. Award each plaintiff Class Member and Subclass Member compensatory damages who has suffered same in an aggregate amount to be proven at the trial;

5. Award Plaintiff Nash and each Subclass Member additional compensatory damages who has suffered same in an aggregate amount of not less than $5,000,000.

6.      Award Plaintiffs threefold damages and reasonable attorney's fees, pursuant to 18 U.S.C. § 1964(c);

7.      Award Plaintiffs' their reasonable attorney's fees, pursuant to 18 U.S.C. § 1595;

8.      Award costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure;

9.      Award pre-and post-judgment interest in the amount of 10% per annum in an amount according to the proof at trial; and

10.     Grant the Plaintiff and Class Members such further relief as the Court may deem just and proper.

DATED this 12th day of February, 2021.

Carlie Sherman, Anna Gozun, Amanda Nash, Andrew Scavuzzo, and Ehan Jelinek, on behalf of themselves and all similarly situated persons, PLAINTIFFS

## **DEMAND FOR TRIAL BY JURY**

PURSUANT TO RULE 38 F.R.C.P., PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL ISSUES TRIABLE OF RIGHT BY A JURY.

By: */s/Brice M. Timmons*
        Brice M. Timmons (TN Bar #29582)
        Craig Edgington (TN Bar #038205)
        Bryce Ashby (TN Bar #026179)
        *Pro Hac Vice*
        Donati Law, PLLC
        1545 Union Ave.
        Memphis, TN  38104
        (901) 209-5500
        Fax: (901) 278-3111

craig@donatilaw.com
brice@donatilaw.com
bryce@donatilaw.com

Michael Rosenthal, WSB #5-2099
Nathan Nicholas, WSB #7-5078
Hathaway & Kunz, LLP
P.O. Box 1208
Cheyenne, WY 82003-1208
(307) 634-7723
Fax: (307) 634-0985
mike@hkwyolaw.com
nnicholas@hkwyolaw.com

Frank L. Watson, III (TN Bar #015073)
*Pro Hac Vice*
Watson Burns, PLLC
253 Adams Avenue
Memphis, TN 38104
(901) 529-7996
Fax: (901) 529-7998
fwatson@watsonburns.com

ATTORNEYS FOR PLAINTIFFS AND
PUTATIVE CLASS MEMBERS

## CERTIFICATE OF SERVICE

This is to certify that on the 12th day of February, 2021, a true and correct copy of the foregoing was served upon counsel as follows:

Rick L. Koehmstedt                                      [ x ]  CM/ECF
SCHWARTZ, BON, WALKER & STUDER, LLC    [   ]  U.S. Mail
141 South Center Street, Suite 500                [   ]  Fax:  (307) 234-5099
Casper, WY 82601                                        [   ]  E-mail:  rick@schwartzbon.com


Patricia K. Buchanan                                   [ x ]  CM/ECF
Patterson Buchanan Fobes & Leitch, Inc., P .S.  [   ]  U.S. Mail
1000 Second Ave., 30th Floor                        [   ]  Fax:
Seattle, WA 98104                                       [   ]  E-mail:
                                                                     pkb@pattersonbuchanan.com


Thomas Quinn                                            [ x ]  CM/ECF
Lillian L. Alves                                           [   ]  U.S. Mail
GORDON REES SCULLY MANSUKHANI, LLP  [   ]  Fax:  (303) 534-5161
555 Seventeenth Street, Suite 3400               [   ]  E-mail:  tquinn@grsm.com
Denver, CO  80202                                      lalves@grsm.com


Lindsey M. Romano                                      [ x ]  CM/ECF
Gordon Rees Scully Mansukhani, LLP             [   ]  U.S. Mail
275 Battery Street, Suite 200                        [   ]  Fax:
San Francisco, CA  94111                             [   ]  E-mail:  lromano@grsm.com
Phone:  415-986-5900
lromano@grsm.com


Paul J. Hickey                                            [ x ]  CM/ECF
Loyd E. Smith                                            [   ]  U.S. Mail
HICKEY & EVANS, LLP                                [   ]  Fax:  (307) 638-7335
1800 Carey Avenue, Suite 700                      [   ]  E-mail:
P.O. Box 467                                              phickey@hickeyevans.com
Cheyenne, WY 82003-0467                          lsmith@hickeyevans.com

Jane M. France                                          [ x ]  CM/ECF
SUNDAHL, POWERS, KAPP & MARTIN, LLC                      [   ]  U.S. Mail
1725 Carey Avenue                                       [   ]  Fax:  (307) 632-7216
P.O. Box 328                                            [   ]  E-mail:  jfrance@spkm.org
Cheyenne, WY  82003

Makenna J. Stoakes,                                     [ x ]  CM/ECF
Patrick J. Sodoro                                       [   ]  U.S. Mail
Sodoro, Mooney, Lenaghan                                [   ]  Fax:
13924 God Circle                                        [   ]  E-mail:
Omaha, NE  68144                                              mstoakes@smllawoffice.com
                                                             psodoro@smllawoffice.com

Monty L. Barnett                                        [ x ]  CM/ECF
Rachel E. Ryckman                                       [   ]  U.S. Mail
Keith R. Olivera                                        [   ]  Fax:
WHITE AND STEELE, P.C.                                  [   ]  E-mail: mbarnett@wsteele.com
Dominion Towers, North Tower                                  rryckman@wsteele.com
600 17th Street, Suite 600N                                   kolivera@wsteele.com
Denver, CO 80202-5406

Traci L. Lacock,                                        [ x ]  CM/ECF
Hirst Applegate, LLP                                    [   ]  U.S. Mail
P.O. Box 1083                                           [   ]  Fax:  (307) 632-4999
Cheyenne, WY 82003-1083                                 [   ]  E-mail:
                                                             tlacock@hirstapplegate.com

Mara Cohara                                             [ x ]  CM/ECF
Brian Fries                                             [   ]  U.S. Mail
Lathrop GPM LLP                                         [   ]  Fax:
2345 Grand Blvd., Suite 2200                            [   ]  E-mail:
Kansas City, MO  64108-2618                                  mara.cohara@lathropgpm.com
                                                             brianfries@lathropgpm.com

Tim Stubson                                             [ x ]  CM/ECF
CROWLEY FLECK PLLP                                      [   ]  U.S. Mail
111 West 2nd Street, Suite 220                          [   ]  Fax:  (307) 265-2307
Casper, WY  82601                                       [   ]  E-mail:
                                                             tstubson@crowleyfleck.com

Zenith Ward                                    [ x ]  CM/ECF
Buchhammer & Ward, P.C.                         [   ]  U.S. Mail
1821 Logan Avenue                               [   ]  Fax:  (307) 634-2199
P.O. Box 568                                    [   ]  E-mail:   zsw@wyoming.com
Cheyenne, WY 82003-0568

John C. Matthews                                [   ]  CM/ECF
*PRO HAC VICE - PENDING*                         [   ]  U.S. Mail
WHITE AND STEELE, P.C.                           [   ]  FAX
600 17th Street, Suite 600N                     [ x ]  EMAIL
Denver, CO  80202                               jmatthews@wsteele.com


                                    */s/ Brice M. Timmons*